**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY NEUPAUER, JR. and**<br>**JEAN NEUPAUER, his wife,** | : | |
| | : | |
| **Plaintiffs** | : | **3:15-CV-01903** |
| **v.** | : | **(JUDGE MARIANI)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **DEPARTMENT OF VETERAN** | : | |
| **AFFAIRS, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

The plaintiffs in this case, Gary Neupauer, Jr. and Jean Neupauer, are adult citizens

of the Commonwealth of Pennsylvania who brought suit pursuant to the Federal Tort Claims

Act ("FTCA") 28 U.S.C. § 1346 and §§ 2671-2680.

Plaintiff, Gary Neupauer, is a veteran of the United States Marine Corps from 1969

to 1971 when he was honorably discharged with a rank of lance corporal. He served in

Vietnam and received the National Defense Ribbon, the Vietnam Service Medal, the

Vietnam Campaign Medal, the Presidential Unit Citation, the Combat Action Medal, the

Good Conduct Medal and two Sharp Shooter Badges. (Trial Tr., May 16, 2017, at 57).

Plaintiff, Gary Neupauer, worked for 40 years for a company called Penn

Refrigeration and his employment ended only when the company closed in 2012. He was

employed there as a shearer operator (*Id.* at 58-59).

Prior to initiating this suit, Plaintiffs' counsel submitted to the Department of Veterans Affairs a completed Standard Form 95 as prescribed by the Department of Justice pursuant to 28 C.F.R. § 14.2.  Plaintiff Gary Neupauer received written responses from the U.S. Department of Veterans Affairs Office of Regional Counsel Region IV, Stephen M. Panides, Staff Counsel for the Department of Veterans Affairs (Complaint, Doc. 1, at ¶ 1; Answer, Doc. 18, at ¶ 1).  The Plaintiff has a history of peripheral vascular disease ("PVD").  Dr. Ralph W. DeNatale, a Board certified vascular surgeon, who was accepted as an expert in the field of vascular surgery, (Trial Tr., May 16, 2017, at 8:22-23), defined peripheral vascular disease as "pertain[ing] to the adequacy or the inadequacy of circulation that supplies the leg.  Could be to the thigh, to the knee, to the calf, to the foot."  (*Id*. at 10:1-5)

Dr. DeNatale also defined the term "critical limb ischemia", as "usually mean[ing] that the circulation to that extremity is at a dangerously low level, to the point where the limb is threatened to the point of actually losing the limb." (*Id*. at 10:11-14).

Gary Neupauer has peripheral vascular disease and that disease progressed to critical limb ischemia.  It is the manner in which doctors employed by the United States, Department of Veterans Affairs at the VA Hospital in Wilkes-Barre, Pennsylvania treated Gary Neupauer's condition that led to this lawsuit.   The United States has admitted in its Answer to Plaintiffs' Complaint that "for all times material to the Complaint, Marie J. Adajar, M.D., was considered to be a VA employee for purposes of the Federal Tort Claims Act 28 U.S.C. §§ 2675 and 2679."  (Doc. 18, at ¶ 3).  Likewise, the United States has admitted that

"for all times material to the Complaint Mohammad A. Shaikh, M.D., was considered to be a VA employee for purposes of the Federal Tort Claims Act . . ." (*Id.* at ¶ 4). These two physicians, Dr. Adajar and Dr. Shaikh, are the principal actors on behalf of the United States whose actions are at issue in this case. From the outset, the United States has acknowledged that it agrees with the plaintiffs' expert Dr. DeNatale, that Drs. Adajar and Shaikh and by extension, the United States, breached the standard of care that was owed to Gary Neupauer in the manner in which he was treated and that as a result of that breach in the standard of care he suffered tissue loss and amputation. Specifically, at the outset of trial, counsel for the United States made the following statement:

> One, that we were, at that time, and continuing to try to prove that there's comparative negligence here, that the Plaintiff continued to smoke all these years against medical advice, and it's against that medical advice that he, himself, was also partially responsible for his peripheral vascular disease.
>
> With that said, we hired an expert, that expert is going to be here to testify tomorrow, that expert agreed with their expert. And if you look back at the transcripts that were taken in October and November, what we admitted to, aside from the email, what we admitted to was that we agreed with Plaintiff's expert Dr. DeNatale.
>
> Dr. DeNatale said that, on October 11, when Plaintiff presented to Dr. Adajar, who is on the stand now, he presented with rest pain. That rest pain required an MRA to be done on October 11. Failure to do the MRA on October 11 was breaching the standard of care, we agreed with that.
>
> We also agreed with their expert, and, again, this is in the transcript from our conference, that the failure to do surgery within 24 hours was also a breach in the standard of care. As a result of the breach in the standard of care, he suffered tissue loss and amputation.

Now, we have never said that we were the sole cause, at any point in time, of his injuries. We have always maintained that he is also partially responsible for those injuries and his resulting pain.

(Trial Tr., May 15, 2017, at 5:2-25; 6:1-2).

The above statement from counsel for the United States was followed by the

admission into evidence of Plaintiffs' Exhibit 19, an email from counsel for the United States

to Plaintiffs' counsel wherein Government counsel stated:

The Government is stipulating to liability – That is, its negligence caused the Plaintiff to have his 2 toes amputated. Plain and simple – what are his damages as a result. From our point of view a question remains as to whether he is disabled as a result of the underlying peripheral neuropathy or the loss of his toes, and, whether the pain and suffering he is presently enduring is from the underlying peripheral neuropathy or the loss of his toes. We did not cause the peripheral neuropathy, that goes back to 2004. We are responsible for damages that stem from our negligence only – which resulted in the loss of two toes.

(Pls. Ex. 19).

With the issues in this case having been framed by the acknowledgment by the

Government of a breach of medical care owed to Gary Neupauer by the physicians acting

within the scope of their employment at the VA Hospital, this Court held a non-jury trial on

May 15, 16, and 17, 2017. The Plaintiffs presented the testimony of Dr. Adajar, Dr. Shaikh,

the Plaintiff, Gary Neupauer, Mr. Neupauer's spouse, Jean Neupauer, the testimony of the

Plaintiffs' son, Gary Neupauer, the testimony of its vascular surgeon expert, Dr. Ralph W.

DeNatale, the testimony of Richard Fischbein, M.D., Albert Janerich, M.D., and the

testimony of vocational rehabilitation expert, Patricia Chilleri.

The United States presented the testimony of expert witness, Alexander Uribe.

Based upon the testimony of all of the witnesses and the exhibits entered into evidence, the Court finds that the Plaintiffs have proven all the elements of their claims for medical negligence and that such negligence was a factual cause of the amputation of two toes and tissue loss on Gary Neupauer's left foot and the causally related non-economic losses, past and future economic loss, pain and suffering, embarrassment and humiliation, loss of ability to enjoy pleasure of life, and disfigurement.

The Court finds that the negligence of the United States is the only factual cause of Gary Neupauer's injuries and accordingly assesses 100% of the negligence found to have occurred in the treatment of Mr. Neupauer to the United States.

The Court further finds that the Plaintiffs are entitled to damages in accordance with the findings set forth in this Opinion in the amount of $796,644.00. Judgment will accordingly be entered in favor of Plaintiffs and against the United States in the amount of $796,644.00.

## II. FINDINGS OF FACT

1.     Marie Juliet B. Adajar (hereinafter "Dr. Adajar") is a physician who is Board certified in internal medicine (Trial Tr., May 15, 2017, at 11:1-6).

2.     Dr. Adajar described an internist as follows:

Well, the internist is the gateway to medicine. The patient presents to us with chief complaints, we sort of, like, track the complaints of the patient, and then refer them accordingly to reach every specialty where they would be served best.

(*Id*. at 11:11-15).

3.      Dr. Adajar described peripheral vascular disease as "a hardening of the arteries that can proceed to occlusion, if left unattended.  Several factors can contribute to it. Age, because of the natural process of arthrosclerosis, [*sic*] which is hardening of the arteries, and of course, substances, lifestyle behavior that would accelerate the progression of this illness.  Number one would be smoking." (*Id*. at 11:21-25; 12:1-2).

4.      Dr. Adajar practiced at the Veterans Administration Hospital in Wilkes-Barre, Pennsylvania and was an employee of the United States Government at all times relevant to this case. (Joint Case Management Plan, Doc. 24, at § 1.20)

5.      At all times relevant to this case, Dr. Adajar was an employee, agent and servant of the defendant, United States of America and acting within the scope of her relationship with the defendant with respect to the treatment and care provided to plaintiff, Gary Neupauer. (*See* Notice of Substitution, Doc. 27).

6.      While employed as a physician at the Veterans Administration Hospital, Dr. Adajar began treating Gary Neupauer as an attending physician in 2004. (Trial Tr., May 15, 2017, at 18: 7-8).

7.      At that time, Dr. Adajar was fully aware that Gary Neupauer had had an angioplasty at Mercy Hospital, having reviewed the progress note made by Dr. Alexis, another VA physician.  (*Id*. at 16:25; 17:1-6; 18:20-22).

8.     Dr. Adajar took over the treatment of Gary Neupauer from Dr. Alexis.  (*Id*. at 17:9-14).

9.     After the angioplasty in 2004, Dr. Adajar's records reflected that Gary Neupauer no longer had any claudication when he walks, no cold feet, no color changes in his feet, and suffered no amputation. (*Id*. at 18:23-25; 19:1-7).

10.     As of 2004, Dr. Adajar knew that Gary Neupauer had "a problem with his cholesterol", which was "complicated because or caused by his smoking" and that his family history gave him a risk of peripheral vascular disease in that his father "had a problem with his veins and had died of a heart attack" at an early age. (*Id*. at 19:23-25; 20:1-24).

11.     Gary Neupauer was "strongly advised" to quit smoking. (*Id*. at 19:13-14).

12.     Gary Neupauer was "strongly advised about quitting smoking" and, over the course of time, Dr. Adajar counseled Gary Neupauer about stopping smoking. (Trial Tr., May 15, 2017, at 19:13-14; 20:25; 21:1-3).

13.     Gary Neupauer made an effort to try to stop smoking. (*Id*. at 21:4-25; 22:1-15).

14.     From 2005 onward, all the way to 2013, Dr. Adajar saw Gary Neupauer as his primary care physician and did so continuously.  (*Id*. at 23:13-16).

15.     Dr. Adajar testified:

Q:     The point I was getting to is, you had been Gary's primary care physician, you were fully aware with all of his medical problems and you had seen him on an annual basis from 2005 all the way up to 2013; correct?

A:     Correct, sir.

(*Id*. at 27:8-12).

16.     On October 1, 2013, Gary Neupauer called Dr. Adajar and they spoke. (*Id*. at 39:21-23).

17.     Dr. Adajar spoke with Gary Neupauer for 15 minutes.   She testified with respect to that conversation:

Q:     What did he tell you?

A:     He told me that he was having a feeling of being cold on his left foot, and that he had progressive claudication over less than a block, and that he continues to smoke.  He is getting anxious and would like to have some tests done.

Q:     He actually told you that, for the past two weeks, he noticed the cold feel to his left foot; correct?

A.     Yes, sir.

Q:     And progressive claudication, so the Judge understands, what does that mean?

A:     Claudication, sir, is a pain in your lower extremities that you experience when you walk or do anything strenuous.

Q:     So based on the symptoms that Mr. Neupauer told you he was having during that phone call, his arteries were narrowing, is that correct?
A:     It would be fair to assume, sir.

Q:     And it was progressive; correct?

A:     That's what I put in my notes, sir.

(*Id*. at 40:19-25; 41:1-10).

18. Because Gary Neupauer already had established peripheral vascular disease, and had procedures done to correct his peripheral vascular disease, but continued to smoke, and presented with claudication, Dr. Adajar noted as her "number one diagnosis" peripheral vascular disease. (*Id.* at 41:16-21).

19. As a result of her telephone conversation with Gary Neupauer on October 1, 2013, wherein he related feeling a coldness of his left foot, progressive claudication on walking less than a block, and that he was having "rest pain", Dr. Adajar knew something had to be done right away:

Q:     But regardless of that, you knew something had to be done right away,
       would that be correct?

A:     Yes, sir.

(Trial Tr., May 15, 2017, at 42:23-25).

20. Dr. Adajar testified that she knew something had to be done right away because she knew of the danger to Gary Neupauer if he had another blockage like that which he had in 2004, which could place him at risk for the loss of his toes, foot, leg, or his life. (*Id.* at 43:1-8).

21. Dr. Adajar, after speaking with Gary Neupauer, ordered arterial and venous studies. (*Id.* at 43:9-14).

22. Dr. Adajar explained that the arterial studies "which study the arteries as they supply blood to the extremities and the venous system would be to rule out if there are any clots happening." (*Id.* at 43:16-18).

23.     The studies were performed on October 4, 2013.  (*Id*. at 44:1-3).

24.     In addition, Dr. Adajar ordered a study on October 8, 2013 for "pre-op".  She testified that she ordered the chest x-ray pre-op, "just in case they need it, they will have it." (*Id*. at 44: 23-25; 45:7-9).

25.     Gary Neupauer had blood drawn at the VA on October 1, 2013 (Trial Tr., May 15, 2017, at 47:23-25).

26.     An ultrasound was scheduled for October 4 for Gary Neupauer and a chest x-ray on October 8, 2013.  (*Id*. at 48:22-25; 49:1-4).

27.     At the time these appointments were scheduled, Dr. Adajar knew that Gary Neupauer was still smoking, she had discontinued his cholesterol medication, and he was having progressive claudication.  (*Id*. at 49:20-25; 50:1-3).

28.     The arterial studies performed on October 4, 2013 showed there was a decreased blood flow to Gary Neupauer's left leg. (*Id*. at 51: 2-6).

29.     Based on the result of the arterial study, Dr. Adajar testified:

Q:      Based on the result of that arterial study, Gary needed to come in, as I
        think you defined it, ASAP; correct?

A:      Yes, sir.

Q:      And as you define ASAP, that is as soon as possible, is that correct?

A:      Yes, sir.

Q:      And by ASAP, you mean now; correct?

A:      Or next available, sir.

(*Id.* at 51:4-14).

30.     Dr. Adajar was presented with her deposition testimony (Pls. Ex. 10, at 18:21-23) where her testimony was as follows:

Q:      What does ASAP mean to you?

A:      The way it is meant to the whole world.  As soon as possible, that means now.

(Trial Tr., May 15, 2017, at 51:15-19).

31.     At trial, Dr. Adajar testified further as to how she acted "ASAP":

Q:      That was your sworn testimony back in December 2016, is that correct?

A:      Yes, sir, but I would like to clarify.  Now, here, means do something now, it doesn't necessary mean operate now, it means I have to act on the issue at hand now.

        And the way I acted on the ASAP was to call the vascular surgeon now, which I did.  On October 11, when Gary presented to me, I called Dr. Shaikh, and he came into the room right away.

(*Id.* at 51: 22-25; 52:1-4).

32.     From October 4, 2013, through October 11, 2013, Dr. Adajar did not telephone Gary Neupauer and tell him to come to the hospital right away.  Instead, she testified that she "did tell Mr. Neupauer in my note, if signs and systems persist to call E.R." (*Id.* at 53:6-11).

33.     Although the results of the October 4, 2013, test performed on Gary Neupauer showed a decreased blood flow to his left leg, Dr. Adajar did not change Mr.

Neupauer's scheduled October 11 appointment date, which had been scheduled on October 1, to an earlier date. (*Id*. at 54:7-12).

34.    Dr. Adajar testified with respect to the absence of any change in the October 11 date:

> There was no reason for me to change it, sir.  Because an earlier instruction was already given to the patient to contact me or to report to the E.R., if his signs and symptoms progress.  So unless he calls me or if he reported to the E.R., there was no way for me to know if there was a change or a progression of his original complaints on October 1.

(*Id*. at 54:12-18).

35.    Dr. Adajar, when asked why she waited a week to get Gary Neupauer in for an examination testified:

> I put the order to see the patient as soon as all the tests that I ordered are completed, sir, with a specific order that if his signs and symptoms change, to report to Emergency Room or to contact me.

(*Id*. at 55:4-8).

36.    Dr. Adajar saw Gary Neupauer on October 11.  This was the first time she had seen him in person since their phone conversation on October 1.  (Trial Tr., May 15, 2017, at 55:12-18).

37.    Dr. Adajar, in her notes of her meeting with Gary Neupauer on October 11, noted "progressive worsening of pain" and "the pain is present at rest with notable discoloration of his left foot."  She also noted that the result of the arterial study "showed moderate stenosis in the left lower extremity."  (*Id*. at 56:1-9).

38.     Dr. Adajar did not look at the arterial studies done on October 4 until the date of her appointment with Gary Neupauer on October 11.  (*Id*. at 57:7-10).

39.     On October 11, 2013, Gary Neupauer presented to Dr. Adajar with progressive worsening of pain, rest pain, noticeable discoloration over the left foot, and cyanosis.  (*Id*. at 58:2-13).

40.     Dr. Adajar described cyanosis as a "darkish, almost bluish discoloration" and testified that it is a sign "that there is decreased blood flow." (*Id.* at 58: 14-18).

41.     Dr. Adajar noticed "some degree of ischemia" and thus testified:

Q:     Did Gary have critical ischemia in his left leg on October 11?

A:     I know he had ischemia, the severity is not my expertise, which is why, on October 11, as soon as I saw and examined Mr. Neupauer, I called Dr. Shaikh right away, and he came in and saw the patient that same visit.

(*Id*. at 59:13-16).

42.     Dr. Adajar testified that the reason she called Dr. Shaikh was because she was concerned that Gary Neupauer had limb threatening peripheral artery disease.  (Trial Tr., May 15, 2017, at 60:7-10).

43.     Dr. Adajar and Dr. Shaikh both agreed that a MRA, Magnetic Resonance Angiography, needed to be ordered right away. (*Id*. at 60:11-13).

44.     Dr. Adajar testified that she and Dr. Shaikh both agreed that the Magnetic Resonance Angiography should be done ASAP. (*Id*. at 60: 14-16).

45.     Dr. Adajar alternatively testified that "ASAP" means "next available", "late as tomorrow", and "within a 24 hour period".  (*Id*. at 60:17-18; 61:2-10).

46.     Dr. Adajar then testified:

Q:     And would it be fair to state that you wanted it ASAP because you knew of the danger that Gary was at risk for, based upon the fact that he had the blockage in 2004 and based upon the other factors that we have talked about?

A:     Yes, sir.

Q:     You knew that, based upon all the risk factors that he had and based upon his symptoms, that he was at risk of potential amputation, loss of limb; correct?

A:     All the risks related to peripheral vascular disease, yes, sir.

Q:     Including amputation of the toes: correct?

A:     Yes, sir.

Q:     Possible loss of a foot; correct?

A:     Yes, sir.

Q:     Even possible loss of life; correct?

A:     Yes, sir.

Q:     Those were all things that you were aware of on October 11?

A:     Yes, sir, because those are all the things related to peripheral vascular disease, sir.

(*Id*. at 62:1-18).

47.     Dr. Adajar, when asked whether she did not review the results of the MRA until October 17, 2013, testified that "[i]t is possible, sir, that I looked at them and then made a note on October 17 at 12:51." (*Id*. at 64: 24-25; 65:1-2).

48.     Dr. Adajar agreed that there is no other record other than that for October 17, 2013, indicating that she reviewed the MRA results for Gary Neupauer.  (Trial Tr., May 15, 2017, at 65:16-18).

49.     Dr. Adajar testified that the plan was for Gary Neupauer to be seen by Dr. Shaikh on the following Tuesday, or four days later, October 15, 2013. (*Id*. at 65:19-22).

50.     Dr. Adajar, on October 11, 2013, prescribed narcotics for Gary Neupauer for pain and Pletal for reduction of symptoms of intermittent claudication. (*Id*. at 65:25; 66:1-17).

51.     Dr. Adajar acknowledged that a patient will not experience any benefit for two to four weeks after the initiation of Pletal so that it did not help the critical limb ischemia from which Gary Neupauer was immediately suffering. (*Id*. at 66:21-25; 67:1-2).

52.     Dr. Adajar when asked whether on October 11, 2013, anything was done to increase the blood flow to Gary Neupauer's foot to prevent tissue damage, amputation or loss of limb, answered:

> Well, the Pletal, sir, mechanism action is to decrease platelet clotting and decrease the incidence of further clotting, sir, so that was my own initiative. As far as any active intervention that I am looking for from the vascular surgeon, then, no, sir, nothing was done at that point.

(*Id*. at 67:10-14).

53.     During the testimony of Dr. Adajar on May 15, 2017, counsel for the Government stated:

> By the way, your Honor, we have admitted that on October 11, we breached the standard of care, so if this will move it along a little bit.

(*Id*. at 67:22-24).

54.     Gary Neupauer was to have seen Dr. Shaikh on October 15, 2013 and to see him after the completion of the MRA which was also scheduled for October 15, 2013. (Trial Tr., May 15, 2017, at 68:18-25).

55.     The MRA was done a couple hours before the appointment with Dr. Shaikh (*Id*. at 69:1-3).

56.     Dr. Adajar testified that it is "unfair to say that Gary lost his toes, due to his smoking." (*Id*. at 73:25; 74:1-2).

57.     Dr. Adajar ordered the MRA. (*Id*. at 76:16-25).

58.     Dr. Adajar wanted the MRA scheduled within 24 hours. (*Id*.).

59.     Dr. Adajar testified that she had to "beg" for the MRA. She explained what she meant by "beg" as follows:

> Like I said, sir, I already qualified that. To beg means to literally be the one to do it, instead of having my secretary do it. Now, in deference to Dr. Shaikh, sir, I had to ask permission, it's professional courtesy, but he did agree, he came in right away, he agreed to see the patient as soon as the MRA is done.

(*Id*. at 79:22-25; 80:1-2).

60.     Dr. Adajar was presented with her deposition testimony where, when asked why there was a waiting period to schedule Gary Neupauer for an evaluation until October 15, 2013, answered:

> I would not put that date there if that is not what Dr. Shaikh told me, because remember, at the beginning of this conversation, I did not have access to his schedule, to anybody's schedule, not even my own schedule. I had to ask them and beg permission, before I put anything in their slot.

(Trial Tr., May 15, 2017, at 80:5-13).

61.     Dr. Adajar testified that the reason that she did not send Gary Neupauer to the emergency room on October 11 was not because she was afraid to do so for fear of getting into "trouble" at the VA, but rather because "the reason that was not done on October 11 was because Dr. Shaikh who is the expert is already beside me." (*Id* at 82:8-15).

62.     Dr. Adajar testified that from the period of 2005 until 2013, prior to Gary Neupauer having to undergo amputations, he did not have a diagnosis of depression, was never treated for depression, and that she never prescribed him any medications for depression. (*Id*. at 92:21-25; 93:1-8).

63.     Dr. Adajar testified that prior to October, 2013, Gary Neupauer did not have any chronic pain syndrome. (*Id*. at 93:24-25; 94:1).

64.     When Dr. Adajar ordered the arterial duplex studies and the venous duplex studies after speaking with Gary Neupauer on October 1, 2013, she had no problems getting those tests at the VA, and she did so on October 1 to save time so that when she got a specialist involved, the test results would be available. (*Id*. at 97:21-25; 98:1-9).

65.     Dr. Adajar, on October 1, 2013, in her telephone conference with Gary Neupauer, told him to continue the treatment with aspirin for peripheral vascular disease, to stop smoking, and to call 911 if he experienced sudden pain and numbness. (*Id*. at 99:14-22).

66.     Wilkes-Barre VA Medical Center has an emergency room that takes "walk-ins" and it is open 24 hours a day. (Trial Tr., May 15, 2017, at 100:1-5).

67.     The vascular studies ordered by Dr. Adajar were completed on October 4, 2013, and were read by Dr. Shaikh. (*Id*. at 100:14-16).

68.     The studies showed "moderate stenosis in the left extremity." (*Id*. at 100:22-24).

69.     Gary Neupauer's scheduled October 11, 2013, visit with Dr. Adajar "was to evaluate the results of the labs and ancillaries, which is the ultrasound and venous studies done on the patient, as well as his complaints of progressive worsening of pain in the left lower extremity." (*Id*. at 101:18-25).

70.     On October 11, 2013, when Gary Neupauer presented for examination, Dr. Adajar realized that his condition was worsening, specifically, that Gary Neupauer now had rest pain, which is a worsening of his condition.  (*Id*. at 102:1-9).

71.     Dr. Adajar noted in her record that Gary Neupauer's "symptoms were progressively worsening." (*Id*. at 102:14-17).

72. As a result of Gary Neupauer's appointment of October 11, 2013, and Dr. Adajar's having noticed that his symptoms were progressively worsening, she called in a specialist, Dr. Shaikh, immediately. (Trial Tr., May 15, 2017, at 103:12-15).

73. When asked why she called in Dr. Shaikh, Dr. Adajar testified: "because I wanted immediate attention. I needed to take action." (*Id*. at 103:16-18).

74. Dr. Shaikh, a vascular specialist, then came to Dr. Adajar's office to see Gary Neupauer in the examining room. (*Id*. at 103:19-22).

75. When Dr. Shaikh came to Dr. Adajar's office to examine Gary Neupauer, she discussed Gary Neupauer's history and her examination findings with Dr. Shaikh. (*Id*. at 106:2-6).

76. Dr. Adajar fully endorsed the patient to Dr. Shaikh. (*Id*. at 106:7-8).

77. Dr. Adajar was comfortable, after she spoke with Dr. Shaikh on October 11, 2013, that he knew everything that she knew as a result of her examination on October 11, 2013, about Gary Neupauer. (*Id*. at 106:9-13).

78. Dr. Adajar testified that she was looking for Dr. Shaikh to provide her with a treatment plan for Mr. Neupauer and that Dr. Shaikh asked that an MRA be done. (Trial Tr., May 15, 2017, at 106: 14-20).

79. *See also* Statement of Undisputed Facts:

On October 11, 2013, Dr. Shaikh and Dr. Adajar agreed to do an MRA as soon as possible, and they scheduled him [Gary Neupauer] to be seen Dr. Shaikh [*sic*] again on Tuesday October 15, 2013.

(Pls.' Pretrial Memorandum, Doc. 46, at 15, ¶ 1).

80.     Dr. Adajar testified that both she and Dr. Shaikh were, on October 11, 2013, aware that the MRA had been scheduled for Gary Neupauer for four days later on October 15, 2013 and that Gary Neupauer had an appointment with Dr. Shaikh that same day, October 15, 2013. (Trial Tr., May 15, 2017, at 107:17-25; 108:1).

81.     Dr. Adajar left the date for the MRA to the determination of Dr. Shaikh because he was a specialist. (*Id.* at 114:7-9).

82.     For the 8-10 years during which Dr. Adajar served as Gary Neupauer's primary care physician, he had a medical history of peripheral vascular disease of which she was aware and during those years she discussed the dangers of smoking with Gary Neupauer, how smoking affected his particular medical conditions, including his peripheral vascular disease, and suggested that he quit smoking. (*Id.* at 114:10-25; 115:1-2).

83.     Gary Neupauer had a history of tobacco use of 25 years consisting of one and one-half packs of cigarettes per day.  The VA offered him smoking cessation classes but he refused. (*Id.* at 116:11-16).

84.     Dr. Adajar's February 29, 2012 note indicates that Gary Neupauer was advised to quit smoking and advised of the benefits of smoking cessation; that he was offered referral to the Stop Smoking Clinic; and medications for smoking cessation were offered to him. (*Id.* at 119:10-25; 120:1-8).

85.     Dr. Adajar's note of February 12, 2012 also indicates that Gary Neupauer was "trying to quit on his own." (*Id*. at 120:10).

86.     Dr. Adajar testified that she did not believe she had the right to question Dr. Shaikh about when he scheduled his patients. (Trial Tr., May 15, 2017, at 121:11-15).

87.     She testified:

Q:     Isn't that the way it is with all specialists, it's up to them to schedule them how they see fit?

A:     That is correct, sir, it is called professional courtesy.  And they triage their cases, I cannot have control over that.

Q:     Right, and so you cannot then go into Dr. Shaikh's appointment book and say, no, you are not going to see him in four days, you are going to see him in two days; correct?

A:     I cannot do that, sir.

(*Id*. at 121:16-23).

88.     Dr. Mohammed Shaikh testified by video deposition. (*See* Trial Dep. of Dr. Mohammed Shaikh, Pls. Ex. 11).

89.     Dr. Shaikh is Board Certified by the American College of Surgeons. (*Id*. at 10).

90.     Dr. Shaikh testified that he had been re-certified "many times", but "lately, because of the age, they told me you don't need to come for recertification." (*Id*. at 11:17-21).

91.     Dr. Shaikh testified that he does not perform angioplasties because he does not know how to perform that procedure because he had no training in it.  (*Id*. at 25:14-16).

92. Dr. Shaikh never performed an angioplasty, never performed stent placements, and stopped performing bypass procedures in 2012. (*Id.* at 25:14-24).

93. When asked why he stopped performing bypass procedures, Dr. Shaikh testified:

> The reason I stopped is because, as you know, the vascular surgery has become a branch by itself and has board certification. And you must have a certain number of vascular surgeries in a month and in a year to be accepted.
>
> So I didn't have that many, so – and also I didn't have the training for the angioplasty and stenting. Because these days, 90 percent of the cases are going for the stent and angioplasty. So I didn't have any training. Just I stopped doing that.
>
> And another thing is that the other vascular surgeon who was certified who came on board, he was doing this stuff, so we gave it to him to do it.

(*Id.* at 26:2-14).

94. Dr. Shaikh began working at the Wilkes Barre Veterans Administration Hospital in 1998 and continues to be employed there. (Trial Dep. of Dr. Mohammed Shaikh, Pls. Ex. 11, at 28:4-8).

95. Dr. Shaikh testified he commonly evaluates patients with peripheral artery disease. (*Id.* at 29:6-8).

96. Dr. Shaikh testified that as a vascular surgeon, he was trained to recognize when a patient has a "limb-threatening condition." (*Id.* at 34:5-8).

97.     When asked to list the criteria that would indicate to him that a patient needs revascularization or restoration of blood flow to a limb within a 24 or 48 hour period, Dr. Shaikh testified:

> First of all, if the patient has pain.  Pain is a very important thing.  Sometimes pain is in the walk, in the exercise.  Sometimes pain is in the rest.  I mean exercise and rest, both of them.
>
> Number two, as I mentioned, Doppler examination show the critical point.
>
> Number three is the angiography. That if we see the blood supply is very bad, then we'll do surgery if we need it.

(*Id*. at 34:10-22).

98.     Dr. Shaikh testified he sent Gary Neupauer for an MRA after Dr. Adajar asked him what she should do.  (*Id*. at 74:9-13).

99.     Dr. Shaikh further testified that Gary Neupauer "came to my clinic the day that he had the MRA" and that this was the only time Gary Neupauer came to his clinic. (*Id*. at 74:12-16).

100.     Dr. Shaikh testified that he sent Gary Neupauer for an MRA "because Dr. Adajar told me this patient has had the pain and had this Doppler examination."  He testified the "next step" was to send Gary Neupauer for an MRA. (Trial Dep. of Dr. Mohammed Shaikh, Pls. Ex. 11, at 74:23-25; 75:1-5).

101.     Dr. Shaikh, when asked whether he had a concern that Gary Neupauer had a "compromised blood flow to his foot", testified:

A:      With that, I didn't examine.  Just the way that I look at that, they said
        that was the best way to go to.   I said okay. Send him for the MRA to
        see where is the blockage.

. . . .

A:      And that he didn't have that much pain or anything at that time.  She
        said this is a patient with intermittent claudication, has an ABI, such
        and such, and has pain in the foot.

        I said okay.  Send him for an examination.

(*Id*. at 75:16-25).

102.    Dr. Shaikh testified that he sent Gary Neupauer for the MRA. (*Id*. at 76:1-2).

103.    When asked whether he sent Gary Neupauer for an MRA on an ASAP basis,

Dr. Shaikh responded:

A:      I didn't send it.  I told her to do it.

Q:      On an ASAP basis?

A:      That's right.

Q:      So you gave instructions to Dr. Adajar to do it on an ASAP basis?

A:      That's right.

(*Id*. at 76:5-10).

104.    Dr. Shaikh testified that he made the decision to send Gary Neupauer for the

MRA on an ASAP basis rather than an emergency basis.  He testified:

A:      The way that she told me that this patient has pain in the foot and he
        has gone home and come back and this is it.

        I said – also that reason was that I said okay.  Do it and I will – let me
        know the result.

(*Id.* at 76:18-24).

105.    Dr. Shaikh, in further explaining how he determined that the MRA should be done on an ASAP basis rather than on an emergency basis, testified that Mr. Neupauer's condition was not an emergency.  Specifically, he testified:

> Q:     My question is, Doctor, how did you make a decision that – and it was on a Thursday, as I recall. How did you make a decision on a Thursday, the 11, to decide to do it on an emergent basis, on an ASAP basis, or it could wait?
>
> A.:    The way that we look at that, it wasn't that very bad.  Didn't need any emergency.
>
> Q:     Okay.
>
> A:     So that's the thing. I said do it as an ASAP and I will look at and let me know the results.

(*Id.* at 78:14-23).

106.    Dr. Shaikh testified he relied on Dr. Adajar's description of Gary Neupauer's left foot to make a determination as to whether Neupauer had or did not have a critical limb ischemia.  (Trial Dep. of Dr. Mohammed Shaikh, Pls. Ex. 11, at 79:23-25; 80:1-9).

107.    He testified:  "the way that she told me, I said okay.  It's not urgent.  It's not emergency.  So let's do it that way.  And also I can see him on Tuesday that I have the clinic."  (*Id.* at 80:1-12).

108.    Dr. Shaikh testified he did not remember whether on October 11, "if I went to see that foot or not, but I remember I talked with Dr. Adajar." (*Id.* at 81:9-25; 82:1).

109.    Dr. Shaikh testified he did not remember whether he had Gary Neupauer take off his shoe or his sock, and did not recall determining the temperature of Mr. Neupauer's foot. (*Id.* at 82:9-18).

110.    Dr. Shaikh testified he did not know whether Gary Neupauer's foot exhibited rubor.[1]  (*Id.* at 82:19-21).

111.    Dr. Shaikh testified he did not remember whether he did a physical examination with respect to Gary Neupauer and testified that "she [Dr. Adajar] told me what was going on." (*Id.* at 85:12-15).

112.    Dr. Shaikh did testify that he and Dr. Adajar agreed to have an MRA done on October 15, 2013, and that he was to meet with Gary Neupauer on that same day.  (*Id.* at 85:24-25; 86:1-3).

113.    Dr. Shaikh testified that he was aware of the condition of Gary Neupauer's left foot as reflected at page 151 of the medical records documenting Gary Neupauer's history. He further testified that he was aware that Mr. Neupauer had pain even at rest which indicated that there was a compromised blood flow, and that there was "notable

---

[1] Plaintiffs' expert Dr. Ralph DeNatale defined "rubor" as follows:

Dependent rubor, that's usually in an end stage finding, someone that has critical limb ischemia, someone who has very poor circulation might come in with dependent rubor. Dependent rubor, basically, is the appearance of the foot, it can be bright red, and that's usually related to the fact that the blood vessels of the foot are maximally dilated, that's the body's way of trying to get as much circulation to the foot as you can. In the presence of poor circulation, the vessels will dilate so the foot can look bright red, oftentimes, related to the patient dangling his foot over the side of the bed to allow gravity to do its job and try to get blood to enter the foot that way.

(Trial Tr., May 16, 2017, at 13:17-25; 14:1-4).

discoloration over the left foot." (Trial Dep. of Dr. Mohammed Shaikh, Pls. Ex. 11, at 86:20-25; 87:1-24).

114.    Dr. Shaikh, when asked whether there was anything in the medical records that would indicate that the MRA could wait until Tuesday, October 15, 2013, testified:

> A:    The way I remember, it wasn't that bad that warranted emergency. The way I look at that at that time – I don't recall it completely – that he could have done it and come back to see me because he was – he has been – she has been following this patient for a few days or weeks and not much changed from the previous study.
>
> So I said okay.  Do it and we'll look at that.
>
> Q:    What was the temperature in his foot?
>
> A:    I don't know. I don't know.  I didn't – as I told you, I didn't touch it.
>
> Q:    You didn't do a physical examination?
>
> A:    No. She did it and she told me.
>
> Q:    Did she tell you what the temperature was?
>
> A:    No.

(*Id*. at 88:1-18).

115.    Dr. Shaikh testified that he knew that Gary Neupauer had rest pain and that he should be sent for the MRA.  (*Id*. at 88:23-25; 89:1-3).

116.    He again testified as to the condition of Gary Neupauer's left foot:  "It wasn't – the time I saw that, it wasn't maybe that – not that bad that I said okay.  I will – do it and I will see him on Tuesday." (*Id*. at 89:2-6).

117.    Dr. Shaikh when asked again whether he did a physical examination of Gary Neupauer's left foot testified "I don't remember." And, with respect to the type of examination Dr. Adajar conducted of Mr. Neupauer's left foot, he testified "I don't know what did she do. But the way that she has written, she did everything." (*Id.* at 89:7-9, 14-17).

118.    When asked who made the decision "of getting an MRA on Monday or Tuesday versus getting an MRA on Friday, Dr. Shaikh testified: "at the time we examined, it wasn't that bad." (*Id.* at 93:6-10).

119.    Dr. Shaikh testified that he had no basis to disagree with Dr. Adajar's note and her finding that Gary Neupauer had diminished pulses and cyanosis in his left foot on October 11, 2013, and no basis to disagree with her finding that Gary Neupauer had pain even at rest. (Trial Dep. of Dr. Mohammed Shaikh, Pls. Ex. 11, at 115:17-25).

120.    Dr. Shaikh, when asked why he believed it was safe to wait another four days before Gary Neupauer's next evaluation, i.e. October 11 to October 15, 2013, testified: "He has been followed by Dr. Adajar and for two, three weeks and not much change, so I said okay.  If he can wait two, three days, do it, that MRA, and it depends." (*Id.* at 119:16-23).

121.    Dr. Shaikh testified that Gary Neupauer's condition on October 11, 2013, "wasn't that bad to send it to Geisinger." (*Id.* at 127:10-15).

122.    The MRA was performed with respect to Gary Neupauer's lower left extremity on October 15, 2013.  (*Id.* at 128:21-23).

123. The MRA was ordered "pre-op", which means "before surgery." (*Id*. at 128:21-25; 130:2-3).

124. Dr. Shaikh testified that considering Gary Neupauer's rest pain, his cyanosis, and the findings of the MRA, that he was suffering from critical limb ischemia of the foot and that he had no doubt as to the existence of these conditions. (*Id*. at 135:24-25; 136:1-10).

125. During the trial deposition testimony of Dr. Shaikh, the Government stated: "We've admitted to negligence. We've admitted that the proper care wasn't provided." (Trial Dep. of Dr. Mohammed Shaikh, Pls. Ex. 11, at 141:8-13).

126. Dr. Shaikh repeated his testimony that on October 11, 2013, the condition of Gary Neupauer's left lower extremity and foot did not present an emergency. (*Id*. at 176:15-17). Dr. Shaikh reaffirmed his testimony as follows:

Q:     Could Gary have gotten an MRA on the 11 had you decided to order one?

A:     We decided he needs MRA but not emergency, urgently.

Q:     My question isn't, doctor, what you decided on or what you didn't decide on. I am asking you factually –

A:     Okay.

Q:      – if you had decided that Gary needed an MRA on the 11 –

A:     Would have done it right away.

Q:     – could you have gotten it done?

A:     Yes.

Q:     Okay.  If the MRA results came back as they did on the 15, could Gary have been taken in for surgery on – within a 24-hour period?

A:     Not that stat.  Because that day we saw Gary, it wasn't that bad.  So MRA showed something.  I'm sure they will show something that was a little different from the one they did on 15.  And then it wasn't rushed that way.  They would have done it in a – again "as soon as possible" means few days.

Q:     Are you aware that Gary suffered an amputation of two of his toes, Doctor?

A:     I don't know anything about that.  I will tell you that.  The only thing I know, I saw the patient only half – 15, 20 minutes, and after that, I didn't see him, and he was sent to Dr. Calderin.  That's all that I remember.

(*Id*. at 192:12-25; 193:1-15).

127.    Dr. Ralph W. DeNatale became certified in vascular surgery in 1990 and re-certified in vascular surgery in 1999 and 2009. (Trial Tr., May 16, 2017, at 5:22-24; 6:5-8).

128.    Dr. DeNatale's vascular practice is 100% vascular surgery.  He takes care of patients who have any type of vascular problems or vascular disease, excluding diseases of the heart and blood vessels of the brain. (*Id.* at 7:11-19).

129.    Dr. DeNatale has been engaged in the practice of vascular surgery for 31 years and evaluates patients with peripheral vascular disease "pretty much daily." (*Id.* at 7:20-25).

130.    Dr. DeNatale testified that he performs stenting procedures "usually every week", bypass procedures "usually every week", and is on the staff of the Yale New Haven Hospital. (*Id*. at 8:1-6).

131.     Dr. DeNatale is licensed to practice medicine in the state of Connecticut.  (*Id.* at 8:9-10).

132.     Dr. DeNatale was admitted as an expert in the field of vascular surgery without objection. (*Id.* at 8:17-21).

133.     Dr. DeNatale defined peripheral vascular disease as:

Peripheral vascular disease most commonly is, when we talk about it, we talk about circulation of the leg, and it pertains to the adequacy or the inadequacy of circulation that supplies the leg.  Could be to the thigh, to the knee, to the calf, to the foot.

(Trial Tr., May 16, 2017, at 10:1-5).

134.     Dr. DeNatale explained the terms "ischemia" and "critical limb ischemia" as follows:

Q:     What is ischemia, Doctor?

A:     Ischemia means lack of circulation to an organ.  In this particular case, we're talking about lack of circulation to a leg, a left leg.

Q:     What is critical ischemia?

A:     Critical limb ischemia, when we use that term, it usually means that the circulation to that extremity is at a dangerously low level, to the point where the limb is threatened to the point of actually losing the limb.

 (*Id.* at 10:6-14).

135.     Dr. DeNatale identified the risk factors for peripheral vascular disease as family history, history of the patient, elevated cholesterol, history of smoking, and patients who are diabetics.  (*Id.* at 10:18-22).

136.    Dr. DeNatale identified the symptoms of peripheral vascular disease as "inability to walk certain distances, whereupon, with exercise, walking a certain distance the muscles of the leg will cramp up, requiring them either to slow down or stop." (*Id*. at 11:2-6).

137.    Dr. DeNatale testified that the patient's symptoms are very important in indicating the severity of the disease, that they provide "a good sense of how far advanced the disease process is, based on the symptoms the patient presents with." (*Id*. at 12:10-14).

138.    Dr. DeNatale further testified that the "pulse status" is very important in that the presence or absence of a pulse or a diminished pulse as determined through the use of a stethoscope, can determine whether there is narrowing of the blood vessels. (*Id*. at 13:2-14).

139.    Dr. DeNatale testified that "[c]yanosis is, basically, when the blood in the foot really isn't oxygenated, so it pools there, sits there." (Trial Tr., May 16, 2017, at 14:6-7).

140.    Dr. DeNatale described Plaintiff's history and physical condition based on the records and information he received.  He testified:

> From the records, the information I got was the history and the physical, the fact that he had a history of claudication, that he had a history of pre-existing disease that dated back to 2004 where his legs were also having issues then. His family history, the fact that he was a smoker, the fact that he has elevated cholesterol.
>
> The fact that he had presented, initially, at least, told that his claudication was worsening, that his foot was cold, he had a non-invasive study, the Doppler studies that showed that the circulation to the left leg was severely impaired.
>
> He had an office visit at the VA Hospital which confirmed the absence of pulses, the discoloration of the foot, he had presented to the VA Hospital with rest pain.  Those were altogether taken in one neat package to show he was heading towards and had developed critical limb ischemia.

(*Id.* at 16:5-19).

141.     When asked what the significance was of the note made by Dr. Adajar stating

"progressive worsening of pain at the left lower extremity", Dr. DeNatale testified:

> A:     Yes.  Well, that again, is part of the history of the patient, and that's
> why the patient called on October 1 and spoke to Dr. Adajar to let her
> know that he was concerned, because, now, he could walk less than
> one block, and his foot had been cold, as well, and that had been
> going on for two weeks.
>
> So that would indicate there has been a worsening of his circulation,
> especially, in someone that's had pre-existing disease dating back to
> 2004.

(*Id.* at 18:21-25; 19:1-4).

142.     As to the notation of "pain is present even at rest", made by Dr. Adajar, Dr.

DeNatale testified that "[p]ain at rest, now, you're getting to critical limb ischemia.  It means

that the circulation is so severe that even, at rest, you have symptoms.  This is a bad sign

for vascular surgeons and for the patient." (*Id.* at 19:9-12).

143.     Dr. DeNatale was asked for his opinion as to what was required for the

treatment of Gary Neupauer as of October 11, 2013.  (*Id.* at 20: 2-3).

144.     Dr. DeNatale responded:  "Well, at this point, was for them to take the next

step.  So I don't disagree with the fact that they wanted to do an MRA, that was a good

choice, but you need to do that rapidly, within 24 hours of someone that has rest pain." (*Id.*

at 20:4-7).

145.    Dr. DeNatale testified that within a reasonable degree of medical certainty, there was a deviation from the standard of care in the treatment of Gary Neupauer.  That testimony is as follows:

Q:    Do you have an opinion within a reasonable degree of medical certainty, as to whether there was a deviation from the standard of care?

A:    Yes.

Q:    Can you explain to the Judge what the deviation was?

A:    The deviation was the fact that there was a significant delay in providing treatment to Mr. Neupauer.  My feeling in that opinion is, had they acted upon his symptoms and his findings early, basically, around the 11th of October, have acted on those findings and actually treated him surgically, that he would have, more likely than not, would have not lost his toes.

      And point of fact, had they acted even earlier than that, I would be almost 100 percent certain he would not have lost his toes.  What I mean by that is, if they had acted upon that Doppler study on the 4th, if they had moved up the timetable to that time, then, there would have been no question in my mind they would have saved his toes.

Q:    How did this affect his chances on the 11th, when he didn't get the – Doctor, did he get the MRA in a timely fashion?

A:    No, he did not.  There was a delay of three or four days before they actually got the MRA and even a further delay, by the time they got the interpretation of it.

Q:    Had they gotten the MRA, what would be the next step?

A:    Next step would have been surgery.

(Trial Tr., May 16, 2017, at 20:10-25; 21:1-10).

146.    Dr. DeNatale testified that it would have been a deviation from the standard of care if the VA treating physicians did not get the MRA and Gary Neupauer into surgery within 48 hours.  (*Id.* at 21:18-22).

147.    Dr. DeNatale offered this opinion within a reasonable degree of "vascular certainty." (*Id.* at 21:23-25).

148.    Dr. DeNatale further opined that the deviation from the standard of care took away the chance to save Gary Neupauer's toes.  (*Id.* at 22:1-6).

149.    Dr. DeNatale testified that Gary Neupauer received the appropriate care when he got to Geisinger Medical Center, where surgery was performed the same day that Gary Neupauer presented himself. (*Id.* at 21:11-13).

150.    Dr. DeNatale described the surgery performed at Geisinger on October 16, 2013, to address Gary Neupauer's blockages in the vessels and arteries of his leg:

> Well, they started off with an arteriogram that identified the pathology or the blockages in the leg.  They identified the fact that his main blood vessel to the leg behind his knee, the popliteal artery was occluded.  It was blocked 100 percent.  And they also found that the three blood vessels in his calf were also blocked.
>
> So, in essence, there were two levels of blockages, and they found that there was, basically, no blood getting down to the foot.
>
> So what they ended up doing was, they opened up that 100 percent blockage in the popliteal artery by using a stent, and then the three calf vessels, which were the peroneal, anterior tibial artery and posterior tibial artery, they used both drugs and a mechanical devise to open up those vessels, as well.

And they were successful at doing that, for the most part, when they opened up the vessels pretty much all the way down to the ankle. So they had re-established flow using those modalities down to the ankle.

(*Id*. at 22:10-25; 23:1-2).

151.    Dr. DeNatale provided his professional medical opinion as an expert in vascular surgery that "had the necessary care been provided on 10/11/13 and thereafter at the V.A. Hospital, this patient would not have gone on to develop tissue loss in his left foot." (Trial Tr., May 16, 2017, at 27:5-8).

152.    When asked to explain the basis of his opinion, Dr. DeNatale stated: "In this particular patient, the earlier the treatment, the greater the likelihood of success with surgery and the greater likelihood of not only limb loss but a limb salvage, but saving his toes. So it was that delay in treatment that made the difference." (*Id* at 27:12-16).

153.    On cross-examination of Dr. DeNatale by counsel for the United States, Dr. DeNatale testified:

Q:    The United States admitted to liability here and the United States indicated that it agrees with Plaintiff's expert, Ralph W. DeNatale that:

"An MRA should have been scheduled on October 11, 2013, and that Mr. Neupauer should been scheduled for surgery within 24 hours of the MRA. The failure to schedule an MRA and perform the surgery was a breach in the standard of care and increased the risk of amputation."

That is your opinion, is it not?

A:    Yes.

(*Id*. at 29:24-25; 30:1-8).

154.    On re-direct examination, Dr. DeNatale read the last sentence of his report as follows: "It is my opinion that had the necessary care been provided on 10/11/13 and thereafter at the V.A. Hospital, this patient would not have gone on to develop tissue loss in his left foot." (*Id*. at 30:16-19).

155.    When asked what he meant by "would not have", Dr. DeNatale testified: "Within a reasonable degree of medical certainty, he would have kept his toes." (*Id*. at 30:20-22).

156.    Plaintiff, Gary Neupauer, is 66 years old, having been born 10/9/1951. (Trial Tr., May 16, 2017, at 55:4-5).

157.    Mr. Neupauer is a high school graduate who, after graduation, joined the Marine Corps. (*Id*. at 55:15-18).

158.    Mr. Neupauer served in the Marine Corps for two years and served in Vietnam. (*Id*. at 57:7-10).

159.    He received medals for his military service, including National Defense, Vietnam Campaign Medal, Presidential Unit Citation, Good Conduct and Combat Action, and Sharp Shooter for rifle and pistol. (*Id*. at 57:21-24).

160.    While in Vietnam, Mr. Neupauer engaged in guerilla warfare. (*Id*. at 57:25; 58:1-2).

161.    Plaintiff Neupauer worked at Penn Refrigeration for 40 years, until 2012, when the company ceased operations. (*Id*. at 58:7-8; 21-25; 59:1-2).

162.   While at Penn Refrigeration he was a shearer operator who cut metals to various sizes.  (Trial Tr., May 16, 2017, at 59:4-10).

163.   As a shearer operator, Mr. Neupauer engaged in "a lot of" standing, lifting, carrying, and physical labor. (*Id*. at 59:11-19).

164.   In 2004, Mr. Neupauer underwent surgery at the Mercy Hospital where he testified that he had surgery on the veins in his right foot. (*Id*. at 59:23-25; 60:1-2).

165.   After his surgery in 2004, he returned to work without restrictions as to his ability to stand or walk. (*Id*. at 60:9-13).

166.   In October of 2013, Mr. Neupauer began to develop pain and noticed that his foot was "getting a little cold", and that as he engaged in walking he could only walk a certain distance and "couldn't walk far." (*Id*. at 60:15-22).

167.   As a result of the pain and difficulty walking, Mr. Neupauer went to the VA Hospital and saw Dr. Adajar, who was treating him for sciatica and who told him to do stretching exercises, watch his diet, and stop smoking.  (*Id*. at 61:3-12).

168.   Gary Neupauer had a telephone call with Dr. Adajar on October 1, 2013. (Trial Tr., May 16, 2017, at 61:13-19).

169.   In that telephone call, Gary Neupauer told Dr. Adajar he "had a problem with [his] foot" and that he needed "some type of help." (*Id*. at 61:18-19).

170.   Appointments were made for Gary Neupauer for October 4 and October 11, 2013, each of which he kept. (*Id*. at 62:11-17).

171.    Gary Neupauer described his appointment on October 11.  He testified:

Well, when we went in to see the doctor, she says, you know, What's the problem?  And I told her about my foot.  She said, Let me see your foot. So I took my shoe off and I took my sock off, and when she looked at it, Dr. Adajar says, Oh, I've seen worse.

(*Id*. at 63:6-11).

172.    Mr. Neupauer testified that Dr. Adajar called to see if Dr. Shaikh was still in the building.  (*Id*. at 63:14-15).

173.    Dr. Shaikh, within ten to twenty minutes after being called by Dr. Adajar, came into the room.  Gary Neupauer testified that "Dr. Shaikh looked at my foot, he says, I know what that is.  And he proceeded to go and sit over to the side." (*Id*. at 63:16-22).

174.    Dr. Adajar made appointments for Gary Neupauer to have an ultrasound and an MRA. (Trial Tr., May 16, 2017, at 63:23-25).

175.    Gary Neupauer was scheduled to see Dr. Shaikh on Tuesday, October 15, 2013. (*Id*. at 64:2-41; 10-14).

176.    Mr. Neupauer went for the MRA as scheduled but did not see Dr. Shaikh on October 4 or at any subsequent time until October 15, 2013. (*Id*. at 64:5-14).

177.    Mr. Neupauer testified that on October 15, he did go to see Dr. Shaikh who told him that he had not received the results of the MRA and that Mr. Neupauer would have to come back the following day.  Mr. Neupauer returned the following day with his son.  (*Id*. at 65:6-10).

178.    At this time, Gary Neupauer was unable to walk as a result of the pain and was forced to use a wheelchair.  (*Id*. at 65:14-22).

179.    Gary Neupauer testified that Dr. Adajar did not tell him on October 11, 2013, that if the pain got worse he should go to the hospital and that Dr. Shaikh did not make such a statement to him on the 15th of October, 2013. (*Id*. at 66:1-10).

180.    When Gary Neupauer returned to the VA Hospital accompanied by his son on October 16, 2013, he was seen by someone whom he believed was Dr. Shaikh's assistant who informed him that the results of his MRA had not yet been provided and that authorization for surgery had not yet been given.  (Trial Tr., May 16, 2017, at 66:18-25).

181.    Mr. Neupauer testified that at this meeting with the individual whom he believed was associated with Dr. Shaikh, this person looked at his foot and stated "I think you're getting the run-around" and that in response to a question from Mr. Neupauer's son, said "Off the record, I would get him to Manhattan or up to Geisinger."  (*Id*. at 67:1-6).

182.    Mr. Neupauer was then taken by his son to the emergency room at Geisinger where he was immediately scheduled for surgery.  (*Id*. at 67:9-17).

183.    Mr. Neupauer had a second surgery at Geisinger in December of 2013.  (*Id*. at 67:23-25).    On this occasion, Mr. Neupauer again underwent surgery and part of his great toe was amputated. (*Id*. at 68:10-12).

184.    In January of 2014, Gary Neupauer underwent a second surgery and third surgical procedure to address the infection in his foot. (*Id*. at 68:14-18).

185.     Gary Neupauer had a third surgery in April of 2014, which was the fourth procedure he had undergone since October, 2013.  (Trial Tr., May 16, 2017, at 69:7-8).

186.     Gary Neupauer had both his great toe and the second toe amputated along with a portion of the left foot. (*Id.* at 69:23-25).

187.     Gary Neupauer testified that:

[M]y foot hurts me every day.  There are days where I really could tolerate it. I could say to my wife, I'm really having a good day.  But then, come nighttime, it hurts so bad, I don't like taking the medication, the Percocets, I try and bear and grin, but there are some times I have to take the Percocets.

And during the day, sir, it depends on the day.  It will hurt me all day long, sometimes it won't hurt all day long.  But every night, sir, it hurts, every night. I don't get a break at nighttime.
. . . .

Terrible pain on the top of my foot and the bottom of the foot, and I can't lay, I try to elevate it, put it over to the side, I get up and walk, and when it does get really bad, I will take a Percocet when I can't actually fall asleep.

(*Id.* at 70:1-13; 15-18).

188.     Mr. Neupauer has been prescribed Cymbalta through Dr. Fischbein and takes Coumadin, aspirin, and medication for restless legs syndrome. (*Id.* at 71:2-6; 21-25).

189.     The amputation of two toes affects Gary Neupauer's ability to walk. He testified: "I walk, sort of, with a limp, and I do have to have a shoe on or I cannot walk. And my balance is off quite a bit.  If I have to get up too fast, I will sometimes wobble, I have to grab onto something, and I do get pain walking."  (*Id.* at 72:1-8).  Mr. Neupauer was

observed in the Courtroom on May 16, 2017, and displayed an irregular and unbalanced gait. (*Id*. at 72:19-20).

190.    Mr. Neupauer also removed his shoe and sock for Court examination of his left foot.  (Trial Tr., May 16, 2017, at 72).

191.    Mr. Neupauer testified that before the medical procedures of October of 2013, and the amputations of December 2013, and January and April of 2014, he planned to go to work for his son if he was unable to find other work through the union as a sheet metal worker. (*Id*. at 73:17-25).  Mr. Neupauer testified that as a result of the amputation of his toes he cannot kneel down to work in his garden and must sit.  (*Id*. at 74:19-21).

192.    Mr. Neupauer testified he planned to work to age 75 "easy, at least."  (*Id*. at 74:7-8). Mr. Neupauer testified that he began smoking in high school and continued to do so during his service in the Marine Corps and throughout his adult life.  He testified that although he was told by doctors to stop smoking and tried to do so, he failed. (*Id*. at 75:1-22).

193.    On cross-examination by counsel for the United States, Mr. Neupauer admitted he did not follow up with his union to inquire about the union finding a job for him. (*Id*. at 77:5-8).

194.    Nor did Mr. Neupauer contact anyone at the union to tell them about his foot problem and to tell them he could not work.  (Trial Tr., May 16, 2017, at 77:9-12).

195.    The union did not contact him concerning any jobs. (*Id*. at 77:13-15).

196.    Mr. Neupauer acknowledged that at his deposition he said he had pain about three hours a day in his left foot and that on a normal day his pain was a five or a six out of ten. (*Id.* at 77:16-25).

197.    Mr. Neupauer testified that he takes Percocet during the day but only "rarely, rarely." (*Id.* at 78:2-3).

198.    Mr. Neupauer testified that the surgeries he underwent did not affect his ability to drive a vehicle other than not being able to drive a standard shift. (*Id.* at 78:20-23).

199.    Mr. Neupauer's surgeries did not affect his ability to stay in a car for any period of time. (*Id.* at 78:24-25; 79:1).

200.    Mr. Neupauer's ability to cook and feed himself has not changed as a result of his surgeries; he is able to push a self-propelled mower to cut grass with intermittent breaks after each 15 minute period, and he is able to clear snow from his driveway with a shovel and/or a snowblower, although "not all at once." (Trial Tr., May 16, 2017, at 79:1-14).

201.    Mr. Neupauer stopped bowling and playing softball and stopped shooting pool and playing darts before his surgeries, and not because of his surgeries. (*Id.* at 79:17-25; 80:1-10).

202.    Mr. Neupauer smoked about two packs of cigarettes a day in the 1970s and 1980s. (*Id.* at 81:22-23).

203.     Between 2004 and Mr. Neupauer's surgery in 2013, he smoked about a pack of cigarettes a day.  (*Id.* at 82:20-22; *see also*, Statement of Undisputed Facts, Pls.' Pretrial Memorandum, Doc. 46, at 16, ¶ 6).

204.     Mr. Neupauer was aware of the health dangers associated with smoking and, specifically, the dangers of smoking with respect to his peripheral artery disease.  (Trial Tr., May 16, 2017, at 81:20-21; 82:1-19).

205.     Mr. Neupauer testified that the persons at the VA, including Dr. Alexis and Dr. Adajar told him "smoking is no good for you" and that he "understood that."  (*Id*. at 83:2-8).

206.     Dr. Alexander Uribe, a vascular surgeon licensed to practice in Pennsylvania and Board Certified in Surgery and Special Certification, and in General Vascular Surgery, was called to testify by the United States. (*Id*. at 100:2-10; 101:24-25).

207.     Dr. Uribe was admitted as an expert in vascular surgery and in the treatment of peripheral vascular disease. (*Id.* at 104:22-25).

208.     Dr. Uribe gave his professional medical opinion within a reasonable degree of medical certainty that Mr. Neupauer's smoking contributed to the progression of his vascular disease. (*Id*. at 106:20-25; 107:1-5).

209.     Dr. Uribe testified:

Smoking is one of the highest risk factors for peripheral vascular disease, and being a chronic smoker gives him a very high risk to develop symptoms and significant blockages and the sequelae of those.

(*Id*. at 107:1-5).

210.    Dr. Uribe's report of May 30, 2016 (Gov't. Ex. 18) contains the following statement by him:

> I also feel that Mr. Neupauer's smoking history had a profound effect on the progression of his vascular disease and contributed significantly to his need for intervention and re-vascularization, with the development of osteomyelitis and requiring the amputation of toes.

(Trial Tr., May 16, 2017, at 108:16-25; 109:1-3).

211.    Dr. Uribe repeated this opinion in his direct testimony. (*Id*. at 109:4-13).

212.    Dr. Uribe examined Gary Neupauer in December of 2016 and based on that examination, diagnosed Mr. Neupauer with "ischemic neuropathy" which he termed "chronic" and said "will not improve." (*Id*. at 109:16-25).

213.    Dr. Uribe offered his opinion that Mr. Neupauer would be able to work in a position where he is not standing or walking for long periods of time. (*Id*. at 110:6-14).

214.    Dr. Uribe also opined that Mr. Neupauer's "lower extremity pain is chronic and secondary to ischemia with damage to the nerves." (*Id*. at 111:1-2).

215.    Dr. Uribe when asked what the cause of Mr. Neupauer's ischemic neuropathy is, testified that "it is from occlusion of his vessels from peripheral vascular disease." (*Id*. at 111:8-10).

216.    Dr. Uribe further offered his opinion that Mr. Neupauer's smoking and continued smoking "leaves him at greater risk for developing more issues." (Trial Tr., May 16, 2017, at 111:25; 112:1).

217. In addition, Dr. Uribe testified that Mr. Neupauer's smoking, after his surgery in 2004, increased his risk that he would suffer from peripheral vascular disease in the future, and that his smoking from 2004, after surgery, increased the risk that he would suffer from or need re-vascularization in the future if he developed recurrent symptoms. (*Id.* at 112:4-11). Dr. Uribe also testified:

> Q: My question is, did his smoking, after the surgery in 2013, increase the risk that he would need amputation?
>
> A: I feel that the risk – the high risk for amputation was already there, at the time of the intervention in 2013.

(*Id.* at 112:21-24).

218. Dr. Uribe offered his opinion that Mr. Neupauer's ischemic neuropathy "is secondary to his peripheral vascular disease, which has caused occlusions and lack of circulation into the foot." (*Id.* at 116:19-21).

219. Dr. Uribe agreed that Mr. Neupauer has a disability that causes chronic pain and he does have an inability to walk long distances. (*Id.* at 117:1-4).

220. When asked whether Mr. Neupauer can work, Dr. Uribe responded "it depends on the activity that he needs to do to work." He further offered that he "believe[d]" that Mr. Neupauer could perform work that did not require long distance walking or standing for a great period of time. (*Id.* at 117:5-13).

221. With respect to Mr. Neupauer's continuing to smoke following his surgeries in 2004, Dr. Uribe offered his opinion, within a reasonable degree of medical certainty, that he

"believe[d]" that Mr. Neupauer's smoking contributed to the progression of his peripheral vascular disease. (Trial Tr., May 16, 2017, at 118:5-10).

222.    Dr. Uribe then testified:

Q:     Doctor, did Mr. Neupauer's continuing to smoke against medical advice following his surgery in 2013 contribute to the progression of his peripheral vascular disease and the amputation of his two toes?

A:     It was the cause of it, the gangrene, yes.

Q:     Does Mr. Neupauer's continuing to smoke following his surgeries in 2004, 2013, 2014 contribute to the ischemic neuropathy and chronic pain that he has from the neuropathy?

A:     Ischemic neuropathy can become worsened with continued smoking, yes.

(*Id.* at 118:14-23).

223.    On cross-examination, Dr. Uribe was presented with Plaintiffs' Exhibit 19, the email sent by Government counsel to Plaintiff's counsel on September 6, 2016. The following exchange then occurred:

Q:     Well, the first sentence, read it with me.

        "The Government is stipulating to liability, that is, its negligence caused the Plaintiff to have his two toes amputated."

        Did I read that correctly?

A:     Yes.

Q:     Do you agree with Attorney Thiel's statement?

A:     Yes.

Q:     That's accurate. The Government's negligence caused Mr. Neupauer's two toes to be amputated; correct?

A:     His peripheral vascular disease was not treated effectively, initially, or earlier in October, and required – and he developed gangrenous changes of the toes, which required amputation, yes.

Q:     So this is accurate; correct?

A:     Yes.

Q:     Is that opinion within a reasonable degree of medical certainty in your field of expertise of vascular surgery?

A:     Yes.

(*Id*. at 119:18-25; 120:1-10).

224.   Dr. Uribe acknowledged that he stated in his report that the delay in diagnosis, and the resulting delay in intervention, i.e. the surgery that was performed on October 16, 2013, caused long term ischemic damages. (*Id*. at 121:14-18).

225.   Dr. Uribe then testified:

Q:     That ischemic neuropathy you're talking about there is because of the delay in diagnosis, which delayed intervention and caused long-term ischemic damage; correct?

A:     It's caused by his severe peripheral vascular disease, yes.

Q:     And the delay in intervention?

A:     Yes.

Q:     And the delay, basically, in getting his surgery on October 16, 2013; correct?

A:     Correct.

Q:      So, basically, Gary, at that point in time, because of that delay in intervention, because of the delay in diagnosis and then the delay in intervention, Gary ended up with an amputation of his two toes and ended up with permanent ischemic neuropathy, chronic, will not improve. Correct?

A:      Correct.

Q:      That's your opinion within a reasonable degree of medical certainty as a Board certified vascular surgeon; correct?

A:      Correct.

(*Id*. at 122:4-22).

226.    Dr. Uribe gave a report on May 30, 2016 (Gov't Ex. 18) wherein he stated that "Mr. Neupauer presented in early October 2013 with an ischemic left foot, which required urgent evaluation and treatment"; that "the delay potentially caused tissue loss and then function of his left foot"; and that he felt that "this care did deviate from acceptable medical standards, as diagnoses should have been obtained in early October 2013 with rapid intervention."  (Trial Tr., May 16, 2017, at 123:3-21).

227.    Dr. Uribe then testified:

Q:      And because this wasn't done – I'm not trying to be repetitive – but Gary ended up with permanent neuropathy in his foot and ended up with an amputation of two of his toes; correct?

A:      Correct.

Q:      That's your opinion; correct?

A:      It is.

(*Id*. at 123:25; 124:1-6).

228.    Dr. Uribe further opined that Mr. Neupauer was disabled, due to chronic pain and difficulty ambulating, because of the delay in diagnosis and the delay in intervention. (*Id*. at 124:7-22).

229.    Dr. Uribe, when asked whether the fact that Gary Neupauer was a smoker entitled him to any less of the standard of care, answered "no".  (*Id.* at 125:6-8).

230.    Dr. Richard E. Fischbein, a psychiatrist with subspecialties in psychiatry, conducted an examination of the Plaintiff at the request of Plaintiff's counsel.  (Trial Tr., May 15, 2017, at 129:6-12).

231.    Dr. Fischbein examined Gary Neupauer on October 27, 2016, for approximately one hour and 15 minutes and again on November 15, 2016, for approximately 45 minutes.  (*Id*. at 129:15-18).

232.    Dr. Fischbein also reviewed medical records from the VA Medical Center in Wilkes-Barre, PA, records of Geisinger Wyoming Valley with respect to the Plaintiff's surgeries there, the report of Ralph W. DeNatale, M.D., the independent examination report of Dr. Janerich, a specialist in physical medicine and rehabilitation, dated August 5, 2016, and the records which Dr. Janerich had reviewed in preparation of his report.  (*Id*. at 129:19-25; 130:1-10).

233.    Dr. Fischbein is Board Certified in adult psychiatry and forensic psychiatry. (*Id*. at 133:14-20).

234. Dr. Fischbein is a practicing psychiatrist for over 30 years and has treated "many people with amputation, both lower and upper extremity." (*Id.* at 134:12-22).

235. Dr. Fischbein is licensed to practice medicine in the state of Pennsylvania. (*Id.* at 134:23-25).

236. Dr. Fischbein was admitted without objection as an expert in Forensic Psychiatry as well as Pain Management. (Trial Tr., May 15, 2017, at 141:12-15).

237. Dr. Fischbein, based on his review of the records identified in finding of fact number 232, as well as his interviews with Gary Neupauer and his wife, Jean Neupauer, formed an opinion, within a reasonable degree of medical certainty, that Gary Neupauer suffered from a major depression, single episode of marked severity. (*Id.* at 160:19-25).

238. Dr. Fischbein testified that he had no records to suggest that Gary Neupauer was clinically depressed in the past nor did Mr. Neupauer or Mrs. Neupauer make any statement indicating that Mr. Neupauer was clinically depressed in the past. (*Id.* at 161:1-4).

239. Dr. Fischbein diagnosed Gary Neupauer as having "major depression, single episode of marked severity," and noted that Mr. Neupauer had "poor ability, poor concentration, decreased interest in activities that brought him pleasure in the past," some of which were due to depression and some to physical limitations. (*Id.* at 161:4-9).

240. Dr. Fischbein noted that Mr. Neupauer had sleep disturbances, which he termed another symptom of depression, as well as decreased libido and feelings of

frustration and anger, and that Mr. Neupauer "easily met the criteria for major depressive disorder." (*Id*. at 161:10-14).

241.    Dr. Fischbein testified that Mr. Neupauer started to complain of neuropathic pain after the surgeries and partial amputation of his left foot which caused Dr. Fischbein to believe that it was more likely than not that the neuropathic complaints Mr. Neupauer has are related to his surgeries. (*Id*. at 164:18-23).

242.    Dr. Fischbein further testified that Mr. Neupauer had "classic phantom limb pain" which results from "the nerve fibers that innervate that extremity still can go up to the brain, and the brain has been trapped, that nerve trap is innervated, even where it's amputated, the nerve has memory and the mind has memory, and the person perceives that their toe is still there and they can still move it." (Trial Tr., May 15, 2017, at 165:3-15; 166:5-13).

243.    With respect to the major depression which Dr. Fischbein diagnosed as affecting Gary Neupauer, he testified that the major depression was "the result of having a partial amputation which now has led to phantom limb pain, neuropathic pain, physical limitations and developing, what we see often in people with chronic pain, a secondary major depression as reality sets in and things plateau." (*Id*. at 166:14-25).

244.    Dr. Fischbein recommended that Gary Neupauer be placed on an antidepressant such as Cymbalta and that he been seen by a psychologist experienced in treating depression complicated by chronic pain. (*Id*. at 167:18-25).

245. Dr. Fischbein offered his opinion, within a reasonable degree of medical certainty, as to why Gary Neupauer needs continued medication and psychological treatment, testifying this was necessary "due to his physical limitations, his phantom limb pain, his chronic pain and significant depression, all status post-surgery, to try to save his life." (*Id*. at 170:25; 171:1-25; 172:1-4).

246. On cross-examination, Dr. Fischbein acknowledged that the first time Gary Neupauer was diagnosed with depression was when his counsel sent him to Dr. Fischbein, further stating "I am the first one to diagnose it, but I can tell you that he was depressed by seeing him." (*Id*. at 175:21-22).

247. Albert D. Janerich, M.D., testified via video deposition. A transcript of his deposition was admitted into evidence as Plaintiffs' Exhibit 26. (Trial Tr., May 16, 2017, at 99).

248. Dr. Janerich was admitted as an expert in the field of physical medicine and rehabilitation without objection. (Pls. Ex. 26, at 8).

249. Dr. Janerich performed an independent medical evaluation on Gary Neupauer and issued a report dated August 5, 2016, admitted into evidence as Plaintiffs' Exhibit 15. (Trial Tr., May 16, 2017, at 99).

250. Dr. Janerich, as part of his independent medical examination, reviewed the records of Mercy Hospital – Geisinger South Hospital from August 2014 to the date of his evaluation, as well as the medical records of the Geisinger Wyoming Valley Hospital from

September 2013 through June 2014, and the medical records of the Klynowski Family Practice. He also reviewed a Disability Determination Explanation and an IMA Professional Services records, a note from a Dr. Farrell, a neurologist, and a completed Functional Capacities Assessment. (Pls. Ex. 26, at 10:6-16).

251.    He also performed a physical examination of Gary Neupauer and took a history from Mr. Neupauer which he recounted during his testimony. (*Id.* at 11:1-25; 12:1-25; 13:1-25; 14:1-10).

252.    Within the history presented by Gary Neupauer to Dr. Janerich, he noted the following history with respect to Mr. Neupauer:

> He was then in his usual state of health until October of 2013 when he began noting his left foot was cool and that he developed pain when ambulating less than one city block.
>
> He was seen by his primary care physician, then Dr. Adajar, who felt he was suffering from intermittent claudication. Dr. Adajar had recommended various diagnostic studies included a venous duplex scan of his lower extremities. And over the ensuing weeks he began having significant changes in his foot including increasing pain, discoloration, and temperature and color changes.
>
> He reported that his son recommended that he seek care at Geisinger Wyoming Valley as nothing appeared to have been done regarding his condition.
>
> He was then seen at Geisinger where he had four hospitalizations within a three-month period of time. More specifically, he was initially hospitalized October 16, 2013 at Geisinger Wyoming Valley after presenting to the emergency room for care and treatment surrounding a cold left leg.
>
> During that hospital stay he underwent a left leg angiogram with stent placement and mechanical and chemical thrombectomy of the left posterior tibial and anterior tibial and peroneal arteries.

He was admitted December 3rd, 2013 through December 5th, 2013 for care and treatment surrounding circulatory embarrassment involving the left great toe for which he underwent a left great toe ray amputation with sharp excisional debridement of gangrenous areas of the left foot.

He was next hospitalized January 4th through January 6th, 2014 for further necrotic wound changes around the left great toe amputation. It was during that hospital stay and on January 4th that he underwent a sharp excisional debridement of necrotic wound in the left forefront area followed by application of a wound vac.

Finally, the fourth and last hospitalization at Geisinger was April 17th through April 24th, 2014 during which he underwent further surgery by Dr. Anthony Balsalmo for a bone infection or osteomyelitis which involved the second metatarsal head and the entire proximal second phalanx. Indeed, and on April 21st he underwent an amputation of the second toe with removal of all bony structure and distal metatarsal resection.

He was then discharged to home with an assistive device and over time has progressed to use a cane intermittently.

(*Id*. at 12:11-25; 13:1-25; 14:1-10).

253. Dr. Janerich testified that Mr. Neupauer's chief complaint when he presented was that of left foot pain which he described as varying from sharp to dull but with electric shock like sensations. He also noted that Mr. Neupauer was reliant on medication, including Lyrica, Neurontin, and Percocet, in graded doses for partial relief of his pain. (*Id*. at 14:11-16).

254. Dr. Janerich further noted that Mr. Neupauer's past medical history was "notable for tobacco use disorder, neuropathy and peripheral vascular disease." (*Id*. at 14:19-21).

255.    Dr. Janerich testified that the physical examination he performed with respect to Gary Neupauer was consistent with the history which he obtained from Mr. Neupauer. (*Id*. at 15:24-25; 16:1-2).

256.    Dr. Janerich testified that Mr. Neupauer had findings on examination "consistent with neuropathy, a consequence of the peripheral vascular disease and amputation which he had undergone." (Pls. Ex. 26, at 16:7-10).

257.    Dr. Janerich testified that on his physical examination of Gary Neupauer, Mr. Neupauer had difficulty applying his socks. (*Id*. at 20:3-6).

258.    Dr. Janerich explained this difficulty as follows:

That's part of the neuropathy which he has acquired as a result of the amputation, that sensory hyperesthesia.

(*Id*. at 20:7-10).

259.    Dr. Janerich explained sensory hyperesthesia as increased sensitivity of the skin even to the lightest touch. (*Id*. at 20:19-25).

260.    Dr. Janerich testified that Gary Neupauer has sensory hyperesthesia on a daily basis, "24/7". (*Id*. at 21:1-3).

261.    Dr. Janerich testified that Gary Neupauer's partial amputation of his left foot "has rendered him unable to participate in activities that he used to enjoy freely." (*Id*. at 21:12-18).

262.    He explained why Gary Neupauer is unable to participate in activities that he previously engaged in, stating:

> Well, the foot is very important for many of the gross motor skills that we're involved in, standing, walking, balancing, using our ankle and foot in operating a motor vehicle. These are all activities which are very much requiring of the full and normal use of both lower extremities including our feet. The great toe is particularly needed for balancing.

(Pls. Ex. 26, at 22:1-8).

263.    Dr. Janerich testified that Mr. Neupauer "is limited in household maintenance tasks, ascending and descending a ladder, driving the car of his choice, which used to have a standard transmission, taking care of his pet German Shepard, walking much, lawn care and grocery shopping. Furthermore, he loses his balance and falls." (*Id*. at 22:11-16).

264.    Dr. Janerich testified that Gary Neupauer takes narcotics and Lyrica to control the pain which he is experiencing as a result of his amputation. (*Id*. at 23:2-5).

265.    Dr. Janerich testified that Mr. Neupauer has "reached maximum medical benefit from treatment which has fallen short of a full and complete recovery" and that his partial amputation has created a biomechanical imbalance which will "continue with every single step he tries to take creating an imbalance of forces on the ankle joint, the knee joint, the hip joint and the lower back." (*Id*. at 24:8-17).

266.    According to Dr. Janerich, Gary Neupauer's condition is "currently chronic, permanent and progressive." (*Id*. at 25:9-12).

267.    Dr. Janerich offered his opinion that Gary Neupauer cannot work "because his condition limits him. The physical demands of work exclude what he can do safely." (*Id*. at 29:14-18).

268.    Dr. Janerich offered his opinion with respect to Gary Neupauer's limitations

stated in his report as follows:

> I indicated that Gary can sit for up to eight hours without changes in position. That he can stand no more than one hour.  This is in an eight-hour potential work day.  And that he can walk no more than one hour within an eight hour potential work day.  That he should never lift, carry, push or pull loads greater than ten pounds, though he can occasionally lift and carry loads up to ten pounds.
>
> He can occasionally bend, but never squat, crawl, climb, and he can occasionally reach and twist.  I also indicated that he can use his right and left hand for fine manipulation, simple grasping and pushing and pulling.
>
> He cannot use his left foot for any type of repetitive activities.  And then the question was asked of me can he return to work either full-time or part-time.  None were checked.  Has he achieved maximum medical improvement, I checked yes.  Patient can return to his or her regular occupation, nothing is checked.  And under comments I stated no work is advisable.

(Pls. Ex. 26, at 30:4-23).

269.    When asked why no work is advisable for Gary Neupauer, Dr. Janerich

testified:

> I don't think he can obtain and retain a work – a job in a work environment given the nature of his problem, the physical limitations that he suffers from and his regular use of medication which impairs his cognition.  In other words, he is not as mentally sharp, acute and able as he would otherwise be on these medications which he takes to control his pain and suffering.

(*Id.* at 31:1-8).

270.    Dr. Janerich's report dated August 5, 2016, the Functional Capacities

Checklist completed by Dr. Janerich, and his curriculum vitae were admitted into evidence

as Plaintiffs' Exhibit 15, 15A and 15B. (*See* Trial Tr., May 16, 2017, at 99).

271.     Jean Neupauer is the spouse of Gary Neupauer.  (Trial Tr., May 16, 2017, at 31:20-21).  She testified as to her recollection of the events of October 11, 2013, testifying that she drove Gary Neupauer to the hospital, helped him get into a wheelchair and went to Dr. Adajar's office. (*Id*. at 33:18-22).

272.     She testified that Dr. Adajar examined Mr. Neupauer, looked at the foot, and she asked Dr. Adajar to look at the bottom of Gary Neupauer's foot.  She then testified "and that is when she decided to call Dr. Shaikh."  (*Id*. at 33:23-25; 34:1-3).

273.     Jean Neupauer testified that Dr. Shaikh came to Dr. Adajar's office, looked at Mr. Neupauer's foot and said "Oh, I know what that is. Make an appointment." (*Id*. at 34:5-6).

274.     She did not remember Dr. Shaikh touching Gary Neupauer's foot although he did look at it.  (*Id*. at 34:7-10).

275.     She testified that Dr. Adajar and Dr. Shaikh spoke "a little bit" and that Dr. Adajar made the appointment and then she and Gary Neupauer left and picked up the appointment slip at the desk.  (*Id*. at 34:12-14).

276.     Jean Neupauer testified that neither Dr. Adajar nor Dr. Shaikh told her or Gary Neupauer that if Gary's symptoms became worse that he should go to the Emergency Room.  (Trial Tr., May 16, 2017, at 34:15-20).

277.     Jean Neupauer took Gary Neupauer to his second appointment on October 15, with Dr. Shaikh.  (*Id*. at 23:24).

278.    At the October 15, 2013 meeting, she testified Dr. Shaikh told her and Gary Neupauer that he would have to make another appointment, to return the following day, and that he would not be there. (*Id*. at 35:4-7).

279.    At the October 15 meeting, Dr. Shaikh did not examine Gary Neupauer's foot or ask him to remove his shoe and sock. (*Id*. at 35:8-14).

280.    Jean Neupauer testified that at the appointment of October 15, 2013, Dr. Shaikh did not tell her or Gary Neupauer that he should go to the Emergency Room if his condition worsened.  (*Id*. at 35:23-25; 36:1-3).

281.    When asked to compare Gary Neupauer's demeanor before and after his surgeries and amputation, Jean Neupauer testified:

> He's always been a very easy going, happy go-lucky guy.  After everything, once he got home, I mean, I understand because he was in so much pain, he got very cranky and miserable, no patience whatsoever, none.

(*Id*. at 38:8-12).

282.    She testified that since the surgeries, she and Gary Neupauer have not had "sexual relations" and that they were "sexually active" previously. (*Id*. at 39:3-9).

283.    Gary Albert Neupauer is the son of Plaintiff, Gary Neupauer.  (Trial Tr., May 16, 2017, at 42:3-5).

284.    He testified that he owns Neupauer Trucking, which has one dump truck that hauls blacktop, stone, drill cuttings, and other materials.  (*Id*. at 42:24-25; 43:1-3).

285.    In addition, Neupauer Trucking uses a water truck serving the natural gas industry hauling residual waste/grime water which Neupauer Trucking hauls to other fracking sites where the water is recycled.  (*Id*. at 43: 4-9).

286.    Neupauer Trucking has three employees, excluding Gary A. Neupauer.  (*Id*. at 43:23-25; 44:1).

287.    Gary A. Neupauer testified that the business in which he is a "silent partner" is called O&O Express Incorporated and is a Federal Express Ground contractor with nine routes, nine drivers, and nine trucks, serving various areas of Northeastern Pennsylvania. (*Id*. at 43:10-22).

288.    Gary A. Neupauer testified that after Plaintiff, Gary Neupauer, lost his job as a result of the closing of Penn Refrigeration, he had a conversation with him about Plaintiff Neupauer going to work for him.  (*Id*. at 50:3-25; 51:1-3).

289.    Gary A. Neupauer testified that he would have had work available for his father.  (*Id*. at 51:4-5).

290.    Gary A. Neupauer testified that had the union [Sheet Metal Workers Local 44] not contacted his father when his father's unemployment ran out he would have "absolutely" hired him.  (*Id*. at 52:16-20).

291.    Gary A. Neupauer took photographs of Plaintiff Neupauer's left foot after the December surgery and after the amputations of his toes.  They were admitted into evidence as Plaintiffs' Exhibit 18-7, 18-8 and 18-9. (*Id*. at 53:24-25; 54:1-10).

292.     Patricia Chilleri was called by the Plaintiffs and admitted as an expert in Vocational Rehabilitation and Disability.  (Trial Tr., May 17, 2017, at 6:25; 7:1-7).

293.     Ms. Chilleri reviewed the report of Dr. Janerich of August 5, 2016, the Functional Capacities Checklist of August 17, 2016, the report of Dr. Ralph DeNatale dated July 22, 2015, the report of Dr. J. Wilner dated February 24, 2016, the report of Dr. Richard Fischbein, dated January 9, 2017, and a Social Security Disability Determination Explanation Worksheet.  (*Id.* at 10:23-25; 11:1-5).

294.     Ms. Chilleri also conducted a Transferable Skills Analysis "to determine what type of skills Gary possesses that could possibly transfer to alternative employment." (*Id.* at 7:19-24).   Based on her review of the medical records and her completion of the Transferable Skills Analysis she testified that:

> [T]here are no skills that Gary has that would transfer to light or sedentary work activity.  The skills that he had would transfer to, at the very least, medium work activity which is work which involves lifting or carrying a maximum of 50 pounds, on an occasional basis, more frequent lifting and/or carrying of 25 pounds, but medium-duty involves continuous standing and walking and could possibly involve climbing of ladders.

(*Id.* at 11:24-25; 12:1-6).

295.     Ms. Chilleri offered her professional opinion as to Gary Neupauer's ability to work:

> In my opinion, Mr. Neupauer has a total vocational disability, which would preclude him or eliminate him from performing competitive employment in today's labor market.  In my opinion, there are no jobs that exist in today's labor market that he would be capable of performing on a consistent and sustained basis.

(*Id*. at 13:22-25; 14:1-2).

296. Ms. Chilleri based her opinion upon the medical opinions of Dr. Janerich and Dr. Fischbein while taking into consideration Mr. Neupauer's vocational profile, his age, education, relevant vocational past work, and lack of transferability of skills. (*Id*. at 14:8-13).

297. Ms. Chilleri also testified that Gary Neupauer "has no transferability of skills that would take him down to sedentary or light work." (Trial Tr., May 17, 2017, at 14:14-16).

298. Ms. Chilleri, using Gamboa Gibson Work Life Tables, determined that Gary Neupauer had 4.6 years remaining in his work life expectancy, based on his age, 62, at the time of his surgery and his education at the high school completion level. (*Id*. at 21:16-25).

299. Using Pennsylvania Wilkes-Barre/Scranton Metropolitan Statistical Area ("MSA") statistics, Ms. Chilleri testified that "[t]he median earnings for a cutting machine setter operator in the Wilkes-Barre/Scranton MSA is $35,140 annually, up to $41,320, which falls under the experienced category." (*Id*. 22:8-10).

300. Ms. Chilleri testified that a sheet metal worker who would be more closely classified as a union sheet metal worker presents a salary of $51,520.00 annually up to $61,120.00, as reported in the May 2015 Pennsylvania Occupational Wage Survey. Benefits, such as pension or profit sharing or any type of unionized benefit, are not taken into consideration in these calculations. (*Id*. at 22:15-23).

301.   Ms. Chilleri calculated the anticipated impairment of earning potential over a work life expectancy for Gary Neupauer of 4.6 years in the job of cutting machine setter/operator to be $161,644.00 to $190,072.00. (*See* Pls. Ex. 17, at 18, 22).

302.   Ms. Chilleri calculated that Gary Neupauer's anticipated impairment of earning potential over a 4.6 year work life expectancy as a sheet metal worker yields a median impairment earning of $236,992.00 to $281,152.00 for an experienced sheet metal worker. (*Id.*).

303.   Using an anticipated work life expectancy to age 70, Ms. Chilleri calculated the anticipated impairment of earning potential for a cutting machine operator to be within a range of $281,120.00 to $330,560.00 for an experienced operator.  (*Id.* at 18, 23).

304.   Again using a work life expectancy of 8 years to age 70, Ms. Chilleri testified that the impairment of earning potential for Mr. Neupauer as a sheet metal worker ranges from $412,160.00 to $488,960.00 for an experienced sheet metal worker. (*Id.*).

305.   Based on the physical limitations imposed by Dr. Janerich, Ms. Chilleri testified that Gary Neupauer "can perform sedentary activities."  (Trial Tr., May 17, 2017, at 32:21-25).

306.   Ms. Chilleri testified based on the financial information she reviewed for Mr. Neupauer, the most money he earned in any one year as a shearer operator was $29,539.00 in 2011.  (*Id.* at 33:24-25; 34:1-3).

307.   Ms. Chilleri testified that Gary Neupauer would not qualify medically for the issuance of a CDL ("Commercial Driver's License"). (*Id.* at 40:16-20).

### III.  APPLICABLE LAW

Plaintiffs' claim of negligence against the United States is brought under the FTCA, 28 U.S.C. §§ 1346 and §§ 2671-2680.  The FTCA "provides much-needed relief to those suffering injury from the negligence of government employees," *United States v. Muniz,* 374 U.S. 150, 165, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), by "remov[ing] sovereign immunity of the United States from suits in tort, and with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances", *Podlog v. United States*, 205 F.Supp. 2d 346,355 (M.D. Pa. 2002), *aff'd*, 85 F.App'x 873 (3d Cir. 2003) (quoting *Richards v. United States*, 369 U.S. 1, 6, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)). In FTCA claims, courts must "apply the law of the state in which the act or omission occurred." *Hodge v. United States Dep't of Justice*, 372 F.App'x 264, 267 (3d Cir. 2010) (citing G*ould Elecs. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000)).  Because all of the conduct giving rise to the claims of Gary Neupauer and Jean Neupauer occurred at the VA Hospital in Wilkes-Barre, Pennsylvania, Pennsylvania state law will apply here.

Under Pennsylvania law, "[i]n order to establish a prima facie case of malpractice, the plaintiff must establish (1) a duty owed by the physician to the patient, (2) a breach of duty from the physician to the patient, (3) that the breach of duty was the proximate cause of, or a substantial factor in bringing about the harm suffered by the patient, and (4)

damages suffered by the patient that were a direct result of the harm." *Mitzelfelt v. Kamrin*,

584 A.2d 888, 891 (Pa. 1990).

The Court in *Mitzelfelt,* quoting its prior decision in *Hamil v. Bashline*, 392 A.2d 1280

(Pa. 1978) stated:

> [O]nce a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

584 A.2d at 892.

Thus, once a plaintiff demonstrates increased risk of harm to a reasonable degree of

medical certainty, then the case may be submitted to the finder of fact to determine whether

the increased risk of harm was a "factual cause" of the injury. *Grundowski v. United States*,

2012 WL 1721781, at *6-7 n.5 (M.D. Pa. 2012) (quoting *Gorman v. Costello*, 929 A.2d 1208,

1213 n.7 (Pa. Super. 2007) (noting that "[t]he term 'factual cause' has been adopted to

replace the previously used terms 'substantial factor' and 'legal cause.'")); *see also*, Pa.

S.S.J.I. (Civ.) § 13.20, subcomm. note. The "factual cause" standard is intended to be a

"relaxed standard." *Mitzelfelt,* 584 A.2d at 894. To demonstrate factual cause, "a plaintiff is

not required to show, to a reasonable degree of medical certainty, that the acts or omissions

of the physician *actually* caused the harm to the plaintiff." *Qeisi v. Patel*, 2007 WL 527445,

at *9 (E.D. Pa. 2007). Instead, "[t]o be a factual cause, the conduct must have been an

actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual

cause cannot be an imaginary or fanciful factor having no connection or only an insignificant

connection with the harm." *Grundowski*, 2012 WL 1721781, at *6 (quoting Pa. S.S.J.I. (Civ.) § 3.15); *see also, Gorman,* 929 A.2d at 1212-1213 (same).[2]

However, "to be a factual cause, the defendant's conduct need not be the only factual cause. The fact that some other causes concur with the negligence of the defendant in producing an injury does not relieve the defendant from liability as long as [his or her] own negligence is a factual cause of the injury." *Harris v. Kellogg, Brown & Root Servs., Inc.,* 796 F.Supp.2d. 642, 658 (W.D. Pa. 2011) (quoting Pa. S.S.J.I. (Civ.) § 3.15). *See also*, *Mitzenfelt,* 584 A.2d at 894 (noting that a "defendant cannot escape liability because there was a statistical probability that the harm could have resulted without negligence"); *Jones v. Montefiore Hosp*., 431 A.2d 920, 923 (Pa. 1981) (stating that a plaintiff "need not exclude every possible explanation, and the fact that some other cause concurs with the negligence of a defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence") (internal quotation marks omitted).

Further, where a plaintiff's negligence claim involves an aggravation of a pre-existing condition, "one can recover for an injury regardless of whether there exists a preexisting physical or mental condition as long as one can show that [negligence] was a [factual cause] in bringing about the aggravation of the condition." *Yosuf v. United States*, 642 F.Supp. 415, 430 (M.D. Pa. 1986) (citing *Boushell v. J.H. Beers*, 258 A.2d 682 (Pa. Super.

_____

[2] The instructions in the Pennsylvania Suggested Standard Civil Jury Instructions, § 13.20, were

1969); *Hamil*, 392 A.2d at 1285). Thus, "[i]t is simple black letter law that a tortfeasor must take its victim as it finds him." *Botek v. Mine Safety Appliance Corp*, 611 A.2d 1174, 1177 (Pa. 1992). Accordingly, where a plaintiff has suffered "objective, measurable, observable physical injuries", "[a]ll of the consequent psychological and emotional pain and suffering is compensable in that situation." *Id*.

"Negligence causing aggravation of a pre-existing condition subjects a tortfeasor to the same degree of liability as the infliction of an original wound. The tortfeasor must take his victim as he finds him*." Fretts v. Pavetti*, 422 A.2d 881, 885 (Pa. Super. 1980) (citing *Pavorsky v. Engels,* 188 A.2d 731 (Pa. 1963); *Lebesco v. Southeastern Pennsylvania Transp. Auth.,* 380 A.2d 848 (Pa. Super. 1977)).

The Court in *Lebesco,* in affirming a jury award in favor of the plaintiff who suffered injuries to his leg when he was struck by a trolley car, rejected a contention that the trial court improperly charged the jury that SEPTA could be responsible for harm to the plaintiff resulting from medical treatment plaintiff received as a result of the accident. In a footnote, the Court added:

> Appellant attempts to buttress its contention by emphasizing Appellees' pre-existing vein condition. However, because a tortfeasor must take the victim as he finds him, the tortfeasor is liable for the full extent of the victim's injuries. Thus, a tortfeasor remains responsible for the victim's injuries, even if the victim's particular sensibility resulted in more harm than the tortfeasor could have foreseen.

*Lebesco*, 380 A.2d at 852 n.2.

---

formerly found in § 3.15. *See* Pa. S.S.J.I. (Civ.) § 13.20(†).

## IV. CONCLUSIONS OF LAW

1.      When a plaintiff proceeds under a theory of increased risk, Pennsylvania law requires a two-stage inquiry. *Hamil v. Bashline,* 392 A.2d at 1287. "Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, it becomes a question for the [fact-finder] whether that increased risk was a [factual cause] in producing the harm." *Feeney v. Disston Manor Pers. Care Home, Inc.,* 849 A.2d 590, 595 (Pa. Super. Ct. 2004).

2.      Where the issue of increased risk involves questions of medical causation that go "beyond the knowledge of the average lay person," the plaintiff is required to present expert testimony, "with a reasonable degree of medical certainty, that a defendant's conduct increased the risk of the harm actually sustained." *Vicari v. Spiegel*, 936 A.2d 503, 510 (Pa. Super. Ct. 2007), *aff'd*, 989 A.2d 1277 (Pa. 2010).

3.      Gary Neupauer and Jean Neupauer must prove that the Government's negligence caused their injuries. In limited circumstances, Pennsylvania law "permits recovery where a defendant's negligence increased the risk of harm to a plaintiff, even if the plaintiff cannot show conclusively that no injury would have occurred in the absence of negligence." *Grudowski*, 2012 WL 1721781 *at 7 (quoting *Lempke v. Osmose Util. Servs., Inc.*, 2012 WL 94497, *at 3 (W.D. Pa. 2012)).

4.      "That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty."  *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1259 (Pa. Super. Ct. 2008) (quoting *Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa. Super. Ct. 2004)).

5.      Accordingly, "an expert's opinion will not be deemed deficient merely because he or she failed to use the specific words, 'reasonable degree of medical certainty.'"  *Id.* (citing *Commonwealth v. Spotz*, 756 A.2d 1139 (Pa. 2000) (indicating that "experts are not required to use 'magic words'" but, rather "[Courts] must look to the substance of [the expert's] testimony to determine whether his opinions were based on a reasonable degree of medical certainty rather than upon mere speculation.")).

6.      Once a plaintiff demonstrates increased risk of harm to a reasonable degree of medical certainty, then the case may be submitted to the finder of fact to determine whether the increased risk of harm was a "factual cause" of the injury.  *Grundowski*, 2012 WL 1721781, at *6-7 n.5; see also Pa. S.S.J.I. (Civ.) § 13.20, subcomm. note.

7.      The "factual cause" standard is intended to be a "relaxed standard." *Mitzelfelt,* 585 A.2d 888, 894 (Pa. 1990).  To demonstrate factual cause, "a party is not required to show, to a reasonable degree of medical certainty, that the acts or omissions of the physician *actually* caused the harm to the plaintiff."  *Qeisi v. Patel*, 2007 WL 527445, at *9 (E.D. Pa. 2007).  Instead, "[t]o be a factual cause, the conduct must have been an actual, real factor in causing the harm even if the result is unusual or unexpected.  A factual cause

cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm." *Grundowski*, 2012 WL 1721781, at *6 (quoting Pa. S.S.J.I. (Civ.) § 3.15); *see also, Gorman,* 929 A.2d at 1212-1213 (same).

8.     "[The defendant's] conduct need not be the only factual cause.  The fact that some other causes concur with [defendant's] negligence in producing an injury does not relieve [defendant] from liability as long as [his] [her] own negligence is a factual cause of the injury."  Pa. S.S.J.I. (Civ.) § 13.20.  "Where the negligent conduct of a defendant combines with [other circumstances] [conduct of other persons], the defendant is legally responsible if his or her negligent conduct was one of the factual causes of the harm."  Pa. S.S.J.I. (Civ.) § 13.150.

9.     "A defendant cannot escape liability because there was a statistical probability that the harm could have resulted without negligence.  The fact that some cause concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence."  *Mitzelfelt*, 584 A.2d at 894 (internal quotation marks and citation omitted); *see also, Jones v. Montefiore Hosp*., 431 A. 2d 920, 923 (Pa. 1981) (stating that a plaintiff "need not exclude every possible explanation, and the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have

produced the injury independently of his negligence.") (internal quotation marks and citation omitted).

10.     Where a plaintiff's negligence involves an aggravation of a pre-existing condition, "one can recover for an injury regardless of whether there exists a pre-existing physical or mental condition as long as one can show that [negligence] was a [factual cause] in bringing about the aggravation of the condition." *Yosuf v. United States*, 642 F.Supp. 415, 430-31 (M.D. Pa. 1986) (citing *Boushell v. J.H. Beers*, 258 A.2d 682 (Pa. Super. 1969); *Hamil*, 392 A.2d at 1285).

11.     As a matter of Pennsylvania law, a tortfeasor takes his victim as he finds him. *Botek v. Mine Safety Appliance Corp.*, 611 A.2d 1174, 1177 (1992); *Fretts v. Pavetti*, 422 A.2d 881, 885 (Pa. 1980); *Lebesco v. Southeastern Pennsylvania Transp. Auth.*, 380 A.2d 848, 851 n.2 (Pa. Super. 1977).

12.     "The final element a plaintiff must demonstrate to prevail on a negligence claim is that the breach of a legal duty caused the plaintiff to suffer harm." *Grundowski*, 2012 WL 1721781 at *7 (citing *Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 28 (Pa. 2006)). "Thus, the plaintiff [must have] incurred actual loss or damage." *Id.* (internal quotation marks omitted).

13.     The United States, acting through its employees, agents and representatives, Dr. Marie Adajar and Dr. Mohammed Shaikh, breached the standard of care owed to plaintiff Gary Neupauer.  In support of this conclusion, the Court notes first that counsel for

the United States conceded that Drs. Adajar and Shaikh breached the standard of care by failing to have the MRA performed on October 11, 2013 and by failing to do surgery within 24 hours. Government counsel added: "As a result of the breach in the standard of care, he [plaintiff] suffered tissue loss and amputation." (Trial Tr., May 15, 2017, at 5:2-25; 6:1-2).

In addition, Plaintiffs' Exhibit 19, an email from counsel for the United States to Plaintiffs' counsel contains the following statement:

> The Government is stipulating to liability – That is, its negligence caused the Plaintiff to have his 2 toes amputated. Plain and simple – what are his damages as a result. From our point of view a question remains as to whether he is disabled as a result of the underlying peripheral neuropathy or the loss of his toes, and, whether the pain and suffering he is presently enduring is from the underlying peripheral neuropathy or the loss of his toes. We did not cause the peripheral neuropathy, that goes back to 2004. We are responsible for damages that stem from our negligence only – which resulted in the loss of two toes.

(Pls. Ex. 19).

During the testimony of Dr. Adajar on May 15, 2017, counsel for the Government again acknowledged that "we have admitted on October 11, we breached the standard of care . . . ." (Trial Tr., May 15, 2017, at 67:22-24).

Further, the United States acknowledged that it admitted to liability in this case and that it agreed with Plaintiffs' expert, Ralph W. DeNatale. When Dr. DeNatale was offered for cross-examination, counsel for the United States again admitted its liability in posing the following question to Dr. DeNatale:

Q:    The United States admitted to liability here and the United States indicated that it agrees with Plaintiff's expert, Ralph W. DeNatale that:

"An MRA should have been scheduled on October 11, 2013 and that Mr. Neupauer should have been scheduled for surgery within 24 hours of the MRA. The failure to schedule an MRA and perform the surgery was a breach in the standard of care and increased the risk of amputation."

That is your opinion, is it not?

A:     Yes.

(Trial Tr., May 16, 2017, at 29:24-25; 30:1-8; *see also*, Finding of Fact, at ¶ 153).

14.     The testimony of Plaintiffs' expert, Dr. Ralph W. DeNatale, further establishes that there was a deviation from the standard of care in the treatment of Gary Neupauer. (Finding of Fact, at ¶ 145). Dr. DeNatale testified that:

The deviation was the fact that there was a significant delay in providing treatment to Mr. Neupauer. My feeling in that opinion is, had they acted upon his symptoms and his findings earlier, basically around the 11th of October, have acted on those findings and actually treated him surgically, that he would have, more likely than not, would have not lost his toes.

And point of fact, had they acted even earlier than that, I would be almost 100 percent certain he would not have lost his toes. What I mean by that is, if they had acted upon that Doppler study on the fourth, if they had moved up the timetable to that time, then, there would have been no question in my mind they would have saved his toes.

(*Id.* at ¶ 145; Trial Tr., May 16, 2017, at 20:15-25; 21:1-2).

Dr. DeNatale also testified that it would have been a deviation from the standard of care if the VA treating physicians did not get the MRA and Gary Neupauer into surgery within 48 hours. (Finding of Fact, at ¶ 146). Dr. DeNatale made clear that the deviation from the standard of care took away the chance to save Gary Neupauer's toes. (*Id.* at ¶

148).  The Court finds that Dr. DeNatale's opinions were offered within a reasonable degree of vascular certainty and are credited by the Court.

15.      Dr. Shaikh himself offered testimony that independently establishes a breach of the standard of care with respect to Gary Neupauer's treatment at the VA Hospital by Dr. Adajar and Dr. Shaikh.   On October 11, 2013, Dr. Shaikh and Dr. Adajar agreed that an MRA should be done with respect to Gary Neupauer's left leg and foot as soon as possible and they scheduled him to be seen again on October 15, 2013.   (Finding of Fact, at ¶ 79). The MRA was scheduled for October 15, 2013, four days after the October 11 visit by Gary Neupauer to the VA Hospital where he was examined by Drs. Adajar and Shaikh.   Dr. Shaikh, when asked to list the criteria that would indicate to him that a patient needs re-vascularization or restoration of blood flow to a limb within a 24 or 48 hour period, testified that those criteria include the presence of pain both during exercise and at rest, the results of a Doppler examination and the MRA. (*Id*. at ¶ 97).  Yet Dr. Shaikh made the decision to send Gary Neupauer for the MRA on an "ASAP" basis rather than an emergency basis.  (*Id*. at ¶ 104).

When asked to explain how he determined that the MRA should be done on an ASAP basis rather than on an emergency basis, Dr. Shaikh testified that Gary Neupauer's condition was not an emergency.   Instead, he testified that "[t]he way we look at that, it wasn't that very bad."  Specifically, his testimony was as follows:

> Q:      My question is, Doctor, how did you make a decision that – and it was
>          on a Thursday [*sic*], as I recall. How did you make a decision on a

Thursday, the 11, to decide to do it on an emergent basis, on an ASAP basis, or a could wait?

A.: The way that we look at that, it wasn't that very bad. Didn't need any emergency.

Q: Okay.

A. So that's the thing. I said do it as an ASAP and I will look at and let me know the results.

 (*Id.* at ¶ 105; Trial Tr., May 16, 2017, at 78:14-23).

Dr. Shaikh testified he relied on Dr. Adajar's description of Gary Neupauer's left foot in determining whether Mr. Neupauer had or did not have critical limb ischemia. (Finding of Fact, at ¶ 106). Dr. Shaikh, as the vascular expert called in by Dr. Adajar to examine Gary Neupauer on October 11 (*id.* at ¶¶ 72, 73, 74) should have recognized the need for an immediate MRA with respect to Gary Neupauer's lower left extremity and, based on the results thereof, immediate surgery thereafter. The Court does not credit Dr. Shaikh's statement that he relied on Dr. Adajar's description of Gary Neupauer's left foot to make a determination as to whether Mr. Neupauer did or did not have critical limb ischemia and the Court does not credit Dr. Shaikh's testimony that he scheduled Gary Neupauer for the MRA four days later based on Dr. Adajar's statements to him. Dr. Adajar's testimony shows that she recognized all of the symptoms demonstrating that Gary Neupauer had "limb threatening peripheral artery disease" and that is why she called Dr. Shaikh to the examining room on October 11, 2013. (*Id.* at ¶ 42).

Indeed, Gary Neupauer presented to Dr. Adajar with progressive worsening of pain, rest pain, and noticeable discoloration over the left foot and cyanosis. (*Id*. at ¶¶ 39, 40).

When asked whether Gary Neupauer had critical ischemia in his left leg on October 11, Dr. Adajar testified "I know he had ischemia, the severity is not my expertise, which is why on October 11, as soon as I saw and examined Mr. Neupauer, I called Dr. Shaikh right away, and he came in and saw the patient that same visit." (Finding of Fact, at ¶ 41). Dr. Adajar testified that she wanted the MRA study to be done "ASAP" because she knew that the results of the October 4, 2013 test performed on Gary Neupauer showed a decreased blood flow to the leg (*id*. at ¶ 33) and she knew that Gary Neupauer was at risk for potential amputation, loss of toes, foot, or limb "because those are all the things related to peripheral vascular disease" (*id*. at ¶ 46). Yet, Dr. Shaikh, although he testified that as a vascular surgeon he was trained to recognize when a patient has a "limb-threatening condition" (*id*. at ¶ 96), testified that Gary Neupauer's condition was not an emergency and that an MRA could be done on an as soon as possible basis rather than on an emergency basis. Again, his testimony was: "The way that we look at that, it wasn't that very bad. Didn't need any emergency." (*Id*. at ¶ 105).

Dr. Shaikh also testified that Gary Neupauer's condition on October 11, 2013, "wasn't that bad to send it to Geisinger." (Finding of Fact, at ¶ 121). This determination by Dr. Shaikh that Gary Neupauer did not need an MRA on an emergency basis and that Neupauer could wait until October 15 for the MRA establishes the breach of the standard of

care by Dr. Shaikh in accordance with Dr. DeNatale's expert testimony as to the need for an immediate MRA and fits squarely within the Government's admission of liability here. Further, Dr. Shaikh's breach of the standard of care includes his initial absence of memory as to whether he even examined Mr. Neupauer's foot, as well as his failure to remember if he actually saw Mr. Neupauer's foot or whether Mr. Neupauer had taken off his shoe or his sock (*id*. at ¶¶ 107-109), and his later admission of a failure to conduct an examination. Dr. Shaikh testified he did not recall determining the temperature of Mr. Neupauer's foot; that he did not know whether Gary Neupauer's foot exhibited rubor; and he did not remember whether he did a physical examination, instead testifying that Dr. Adajar told him "what was going on." (*Id*. at ¶¶ 108-111). Later in his testimony, Dr. Shaikh admitted he did not do a physical examination of Gary Neupauer's foot. (*Id*. at ¶ 114). Then, when asked whether there was anything in the medical records that would indicate that the MRA could wait until Tuesday, October 15, 2013, Dr. Shaikh testified:

> The way I remember, it wasn't that bad that warranted emergency. The way I look at that at that time – I don't recall it completely – that he could have done it and come back to see me because he was – he has been – she has been following this patient for a few days or weeks and not much changed from the previous study.

(*Id*.). Yet, Dr. Adajar, in her notes of her meeting with Gary Neupauer on October 11, noted "progressive worsening of pain" and "the pain is present at rest with notable discoloration of his left foot." (*Id*. at ¶ 37). Dr. Shaikh, throughout his testimony, consistently sought to minimize the ever worsening symptoms of critical limb ischemia that were present with

respect to Gary Neupauer's left foot. Dr. DeNatale testified from the records he reviewed that Gary Neupauer's condition had progressively worsened, that his claudication was worsening, that his foot was cold, that the Doppler studies showed circulation to the left leg was severely impaired and that he presented at the VA hospital with the absence of pulses, the discoloration of his foot, and with rest pain. Dr. DeNatale thus testified that "those were altogether taken in one neat package to show he was heading towards and had developed critical limb ischemia." (Finding of Fact, at ¶ 140). Thus, Dr. Shaikh's testimony that Gary Neupauer's condition "wasn't that bad that warranted emergency," that "not much changed" during the weeks when he was followed by Dr. Adajar prior to the October 11 appointment, and that Gary Neupauer's foot "wasn't that very bad" and "didn't need any emergency" (*id*. at ¶¶ 105, 114, 116, 120), compels the conclusion that Dr. Shaikh's negligence breached the standard of care owing to Gary Neupauer in his treatment of Mr. Neupauer's peripheral vascular disease and critical ischemia.

16.     Dr. Marie Adajar also breached the standard of care owing to Gary Neupauer in her treatment of him. Dr. Adajar had followed Mr. Neupauer as his primary care physician from 2005 through 2013. (Finding of Fact, at ¶ 14). She was fully aware of all of his medical problems and had seen him on an annual basis each of those years. (*Id*. at ¶ 15).

Dr. Adajar testified that Gary Neupauer told her on October 1, 2013, "that he was having a feeling of being cold on his left foot, and that he had progressive claudication over less than a block and that he continues to smoke. He is getting anxious and would like to

have some tests done." (*Id*. at ¶¶ 16, 17). Dr. Adajar noted as her "number one diagnosis" peripheral vascular disease (*Id*. at ¶ 18). Dr. Adajar knew as a result of her telephone conversation with Gary Neupauer wherein he related a feeling of coldness of his left foot, progressive claudication on walking less than a block, and that he was having rest pain, that something had to be done "right away." (*Id*. at ¶ 19). She knew that another blockage like the one Mr. Neupauer had in 2004 could place him at risk for the loss of his toes, foot, leg or his life. (*Id*. at ¶ 20). She ordered arterial and venous studies after speaking with Mr. Neupauer, which were performed on October 4, 2013. (Findings of Fact, at ¶¶ 21, 23). The studies showed there was a decreased blood flow to Mr. Neupauer's left leg and she testified that Gary Neupauer needed to come in "ASAP." (*Id*. at ¶¶ 28, 29). This, she testified, meant "now" or "next available." (*Id*. at ¶ 29). Nonetheless, Dr. Adajar did not change Mr. Neupauer's scheduled October 11 appointment date which had been scheduled on October 1, to an earlier date. (*Id*. at ¶ 33). She testified that there was no reason to change the October 11 date because of an earlier instruction she had given to Mr. Neupauer to contact her or report to the emergency room if his signs and symptoms progressed (*id*. at ¶ 34), an assertion denied by both Gary Neupauer and Jean Neupauer (*id.* at ¶¶ 179, 276, 280). What is undisputed is that Dr. Adajar did not telephone Gary Neupauer from October 4, 2013 through October 11, 2013 to inquire as to his condition. (*Id*. at ¶ 32). In a significant lapse, Dr. Adajar did not look at the arterial studies done on

October 4, which showed a decreased blood flow to Mr. Neupauer's left leg until the date of her appointment with Gary Neupauer on October 11. (*Id*. at ¶¶ 33, 38).

This conduct by Dr. Adajar also constitutes a breach of the standard of care owed to Gary Neupauer. It was part of what Dr. DeNatale called the "significant delay in providing treatment to Mr. Neupauer." (Finding of Fact, at ¶ 145). Moreover, Dr. DeNatale testified that had Drs. Adajar and Shaikh acted earlier he was "almost 100 percent certain" that Mr. Neupauer "would not have lost his toes." Dr. DeNatale testified:

> What I mean by that is, if they had acted upon that Doppler study on the 4th, if they had moved up the timetable to that time, then, there would have been no question in my mind they would have saved his toes.

(*Id*.).

Moreover, Dr. Adajar's testimony that she realized on October 11, 2013, that Gary Neupauer's condition was worsening because he now had rest pain and that she noted in her record that Neupauer's "symptoms were progressively worsening" (*id*. at ¶ 70-71), show that her explanation that there was "no reason" to change the October 11 date because "there was no way for me to know if there was a change or a progression of his original complaints on October 1" (*id*. at ¶ 34), is founded on her disregard of what is certainly her established knowledge of the progressive nature of Mr. Neupauer's peripheral vascular disease as well as her admission that she did not even look at the results of the October 4 Doppler test until Mr. Neupauer's October 11, 2013 visit. Dr. Adajar's conduct therefore

presents a breach of the standard of care separate but related to the breaches committed by Dr. Shaikh.

17. The United States' negligence increased the risk that Gary Neupauer would require the amputation of two toes and additional tissue on his left foot and that increased risk was a factual cause in bringing about the amputation and tissue loss. The conduct of the defendant, through Drs. Adajar and Shaikh, is a factual cause of the harm which Gary Neupauer sustained which would not have occurred absent their negligent conduct in his treatment.

The testimony of the Plaintiffs' expert, Dr. DeNatale, and the Government's expert, Dr. Uribe, as well as the judicial admissions made by the United States, establish by overwhelming evidence and beyond question that the defendant's breach of the standard of care increased the risk of amputation and tissue loss to Gary Neupauer and that such increased risk was a factual cause of Gary Neupauer's loss of two toes and tissue in his left foot.

The Government's admission, made at the outset of the trial, is straight-forward. There, the Government stated its agreement with Plaintiffs' expert that "the failure to do surgery within 24 hours was also a breach in the standard of care. As a result of the breach in the standard of care, he suffered tissue loss and amputation." (Trial Tr., May 15, 2017, at 5:2-25; 6:1-2).

To be sure, the Government also stated that "we have never said that we were the sole cause, at any point in time, of his injuries. We have always maintained that he is also partially responsible for those injuries and his resulting pain." (*Id*.)

This statement must be considered in light of Plaintiffs' Exhibit 19, an email from counsel to the United States to Plaintiff's counsel. There, the Government stated:

> The Government is stipulating to liability – That is its negligence caused the Plaintiff to have his two toes amputated. Plain and simple – what are his damages as a result. From our point of view a question remains as to whether he is disabled as a result of the underlying peripheral neuropathy or the loss of his toes, and, whether the pain and suffering he is presently enduring is from the underlying peripheral neuropathy or the loss of his toes. We did not cause the peripheral neuropathy, that goes back to 2004. We are responsible for damages that stem from our negligence only – which resulted in the loss of two toes.

(Pls. Ex. 19).

The Government's contention that there are issues of fact as to whether Gary Neupauer is disabled as a result of the underlying peripheral neuropathy he suffers or the loss of two toes and related tissue he sustained, as well as whether his pain and suffering has as its source the underlying peripheral neuropathy or the loss of his toes, is a separate issue that will be addressed later herein. However, what is clear is that the Government has conceded that it is "responsible for damages that stem from our negligence only – which resulted in the loss of two toes."

The Government's admission that the increased risk of harm caused by its negligence is a factual cause of Gary Neupauer's amputation of two toes and tissue loss in

his left foot is completely consistent with the testimony of both Plaintiffs' expert, Dr. DeNatale, and the Government's expert, Dr. Alexander Uribe. (*See* Findings of Fact, at ¶¶ 132-155 (Dr. DeNatale); *id*. at ¶¶ 217, 223-229 (Dr. Uribe)). Dr. DeNatale testified that there was a deviation from the standard of care in the treatment of Gary Neupauer and described that deviation as:

> [A] significant delay in providing treatment to Mr. Neupauer. My feeling in that opinion is, had they acted upon his symptoms and his findings earlier, basically around the 11th of October, have acted on those findings and actually treated him surgically, that he would have, more likely than not, would have not lost his toes.
>
> And point of fact, had they acted even earlier than that, I would be almost 100 percent certain he would not have lost his toes. What I mean by that is, if they had acted upon that Doppler study on the 4th, if they had moved up the timetable to that time, then, there would have been no question in my mind they would have saved his toes.

(*Id*. at ¶ 145).

Dr. DeNatale offered his expert opinion that the deviation from the standard of care took away the chance to save Gary Neupauer's toes. (*Id*. at ¶ 148). He further testified that "had the necessary care been provided on 10/11/13 and thereafter at the VA Hospital, this patient would not have gone on to develop tissue loss in his left foot." (*Id*. at ¶ 151). Further, when asked by counsel for the United States whether it was his opinion that the failure to schedule an MRA and perform the surgery was a breach in the standard of care and increased the risk of amputation, Dr. DeNatale responded "yes." (*Id*. at ¶ 153). Dr. DeNatale repeated these opinions throughout his testimony. (*See id*. at ¶¶ 154, 155).

Dr. Uribe, the Government's expert, testified that Mr. Neupauer's smoking contributed to the progression of his vascular disease. (Findings of Fact, at ¶¶ 208, 210). His report of May 30, 2016 (Gov't Ex. 18) contains his statement that: "I also feel that Mr. Neupauer's smoking history had a profound effect on the progression of his vascular disease and contributed significantly to his need for intervention and re-vascularization, with the development of osteomyelitis and requiring the amputation of toes." (*Id.* at ¶ 210). However, when asked whether Mr. Neupauer's smoking increased the risk that he would need amputation after surgery, he testified: "I feel that the risk – the high risk for amputation was already there, at the time of the intervention in 2013." (*Id.* at ¶ 217).

Further, on cross-examination, Dr. Uribe was presented with Plaintiffs' Exhibit 19, wherein the Government stated that it was stipulating to liability that "its negligence caused Plaintiff to have two toes amputated." Dr. Uribe testified that he agreed with the Government's stipulation of liability:

> Q:   Do you agree with Attorney Thiel's statement?
>
> A:   Yes.
>
> Q:   That's accurate.   The Government's negligence caused Mr. Neupauer's two toes to be amputated; correct?
>
> A:   His peripheral vascular disease was not treated effectively, initially, or earlier in October, and required – and he developed gangrenous changes of the toes, which required amputation, yes.

(*Id.* at ¶ 223).

Dr. Uribe repeated this opinion that the breach of the standard of care by the United States increased the risk of amputation and caused the loss of Gary Neupauer's toes and tissue of the left foot:

Q: So, basically, Gary, at that point in time, because of that delay in intervention, because of the delay in diagnosis and then the delay in intervention, Gary ended up with an amputation of his two toes and ended up with permanent ischemic neuropathy, chronic, will not improve. Correct?

A: Correct.

Q: That's your opinion within a reasonable degree of medical certainty as a Board certified vascular surgeon; correct?

A: Correct.

(*Id*. at ¶ 225; *see also*, *id*. at ¶¶ 226, 227). For these additional reasons, the Court finds that the breach of the standard of care by the physicians of the VA Hospital was a factual cause of the amputation of the two toes and tissue loss of the left foot sustained by Gary Neupauer and the causally related "permanent ischemic neuropathy, chronic."

18. "In accessing a claim under the FTCA, [the Court] appl[ies] the law of the state in which the act or omission occurred." *Hodge v. U.S. Dep't of Justice*, 372 F. App'x 264, 267 (3d Cir. 2010). "In order to determine whether it has jurisdiction, the court must evaluate whether the United States would be liable under the 'whole law' of the state in which the act or omission occurred." *Gould Elecs. Inc. v. U.S.*, 220 F.3d 169, 179 (3d Cir. 2000). In this case since all actions which formed the basis for Plaintiffs' complaint occurred in Pennsylvania, Pennsylvania law applies.

19.     The provisions of 42 Pa. C.S.A. § 7102, entitled "Comparative Negligence", apply in this case.

20.     Section 7102(a) provides:

(a) General rule.--In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

21.     Section 7201(a) requires this Court to determine whether Plaintiff Gary Neupauer may have been guilty of contributory negligence which would operate to bar his recovery or, if his negligence is found not to be greater than the causal negligence of the United States, to require that any damages sustained by the Plaintiff be diminished in proportion to the amount of negligence attributed to him or Plaintiff Jean Neupauer.

22.     Gary Neupauer's smoking of about two packs of cigarettes a day in the 1970s and 1980s and his continued smoking thereafter as well as his smoking between 2004 and his surgery in 2013, during which he smoked about a pack of cigarettes a day (Findings of Fact, at ¶¶ 202, 203) is not a factual cause of the amputation of his toes and tissue of the left foot.  The United States contends that Mr. Neupauer's smoking history "had a profound effect on the progression of his vascular disease and contributed significantly to his need for intervention and re-vascularization, with the development of osteomyelitis and requiring the amputation of toes." (Gov't Post-Trial Request for Findings of Fact and Conclusions of Law,

Doc. 66, at ¶ 189).   The Government further contends that Mr. Neupauer's continuing to smoke against medical advice contributed to the progression of his peripheral vascular disease and that his continuing to smoke against medical advice following his surgeries in 2004 contributed to the progression of his peripheral vascular disease (*Id.* at ¶¶ 190, 191). The Government also contends that Mr. Neupauer's peripheral vascular disease was more severe in 2013 than it was in 2004 and that the progression of the disease was caused in part by his continued smoking which in turn contributed to his need for surgery in October 2013. (*Id.* at ¶¶ 192, 193).   The Government then proposes that the Court find as a fact that Mr. Neupauer's "continuing to smoke against medical advice following his surgery in 2013 contributed to the progression of his peripheral vascular disease and caused gangrene and the amputation of his two toes."   (*Id.* at ¶ 194). The Government relies on the testimony of Dr. Uribe in submitting these proposed findings of fact.

There is no question, based on Dr. Uribe's testimony, that Mr. Neupauer's smoking contributed to the progression of his vascular disease and that being a chronic smoker gave Mr. Neupauer "a very high risk to develop symptoms and significant blockages and the sequelae of those."   (Findings of Fact, at ¶¶ 208, 209).   Likewise, the Court notes Dr. Uribe's Report of May 30, 2016 (Gov't Ex. 18), wherein he wrote that "Mr. Neupauer's smoking history had a profound effect on the progression of his vascular disease and contributed significantly to his need for intervention and re-vascularization, with the development of osteomyelitis and requiring the amputation of toes."   (Finding of Fact, at ¶

210). Thus, Mr. Neupauer's smoking, after his surgery in 2004, increased the risk that he would suffer from peripheral vascular disease in the future and increased the risk that he would suffer from or need re-vascularization in the future if he developed recurrent symptoms. (*Id*. at ¶ 217). However, these facts may not be used to find Gary Neupauer contributorily negligent in connection with the amputation of the two toes and related tissue of his left foot which was caused entirely by the breach in the standard of medical care owed to him by Drs. Adajar and Shaikh. While Mr. Neupauer's smoking may have increased the risk that he would need surgery, it was the failure to properly treat Mr. Neupauer from October 1 through October 15, 2013, by Drs. Adajar and Shaikh which made the amputation of Mr. Neupauer's toes and the debridement of his left foot with resulting tissue loss necessary and indeed unavoidable. Dr. Uribe testified that the high risk for amputation was present at the time of intervention in 2013 (*id*.), but that high risk was known by Drs. Adajar and Shaikh and their laxity in reading the results of, and acting upon, the October 4 Doppler studies, their failure to schedule Gary Neupauer for an appointment earlier than October 11, their failure to schedule the MRA earlier than October 15, and the attendant delay in any scheduling of surgery, are the factual causes of Gary Neupauer's amputation of his left toes and left foot tissue. In fact, Dr. Uribe twice admitted that it was the Government's negligence that caused Mr. Neupauer's toes to be amputated, stating "[h]is peripheral vascular disease was not treated effectively, initially, or earlier in October, and required – and he developed gangrenous changes of the toes, which required

amputation, yes." (*Id.* at ¶ 223). He also testified that it was "correct" that "because of the delay in diagnosis and then the delay in intervention, Gary ended up with an amputation of his two toes and ended up with permanent ischemic neuropathy" which was "chronic" and "will not improve." (*Id.* at ¶ 225). (*See also, id.* at ¶¶ 226, 227 (testimony of Dr. Uribe confirming that Gary Neupauer presented in early October 2013 with an ischemic left foot which required urgent evaluation and treatment and because this was not done, Mr. Neupauer suffered permanent neuropathy in his foot and an amputation of his two toes)).

Dr. Uribe also testified that the fact that Gary Neupauer was a smoker did not entitle him to any less of the standard of care. (Finding of Fact, at ¶ 229). This statement by Dr. Uribe is significant because it is entirely in keeping with the principle of law that a tortfeasor must take the victim as he finds him. *Lebesco*, *supra*, 380 A.2d at 852.

The record evidence in this case shows conclusively that Gary Neupauer presented to Drs. Adajar and Shaikh as a man who showed every sign of peripheral vascular disease progressing rapidly to critical ischemia, the total blockage of blood to the foot. Those signs, which were known by Drs. Adajar and Shaikh as signs of critical ischemia, are pain in the foot or leg on exercise, coldness of the foot, cyanosis, rubor, and rest pain. The Doppler test administered on October 4, 2013, showed a decreased blood flow to the left leg of Mr. Neupauer (Finding of Fact, at ¶ 33), and the record is replete with admissions of Dr. Adajar and Dr. Shaikh that Gary Neupauer had limb-threatening peripheral artery disease that required immediate attention (*see id.* at ¶¶ 39-49, 70-71, 72-79, 96-101, 115, 119, 124).

But despite all of these textbook indicia of critical ischemia in Gary Neupauer's lower left extremity, Drs. Adajar and Shaikh did not act in accordance with the medical standard of care which both Drs. DeNatale and Uribe testified should have been followed and which would have required an MRA immediately upon the October 11, 2013, examination of Mr. Neupauer, or as of the October 4 Doppler studies, and surgery within 24 hours thereafter. Indeed, the record reflects that Gary Neupauer went to Geisinger Medical Center the day after his October 15 appointment with Dr. Shaikh and a re-vascularization of his left foot was immediately performed which was too late to save the great toe and the second toe of Mr. Neupauer's left foot and which subjected him to additional surgeries and tissue loss in December of 2013 and in January and April of 2014.  Thus, while Plaintiff's smoking increased his risk of peripheral vascular disease and ischemia, it did not increase the risk of the amputation that Mr. Neupauer was required to undergo where timely medical care, by all of the record evidence, expert testimony, and admission of liability by the Government, would have prevented the amputation and tissue loss and resultant permanent ischemic neuropathy.  For these reasons, the smoking of Gary Neupauer was not a factual cause of the amputation of his toes and related left foot tissue loss.  He is therefore not contributorily negligent in this case.

23.    The Court assesses no amount of negligence to the Plaintiffs.

24.    The Court assesses one hundred percent (100%) of the negligence to the United States.

## Damages

25.     Because the negligence of the United States is the factual cause of the amputation of Mr. Neupauer's two toes and related tissue of his left foot, the Plaintiff is entitled to be adequately compensated for all of the physical injuries and financial damages he has sustained as a result of the negligence found to have occurred in this case.   The amount must completely compensate the Plaintiffs for all damages sustained in the past as well as all damages the Plaintiffs will sustain in the future.  (Pa. S.S.J.I. (Civ.) § 14.150).

26.     Mr. Neupauer is entitled to be compensated in the amount of all past medical expenses reasonably incurred for the diagnosis, treatment and cure of his injuries in the past. (*Id.*).

27.     The Plaintiff is also entitled to be compensated for all medical and other related expenses including expenses for the purchase and replacement of medically necessary equipment that he will reasonably incur in the future for the treatment and care of his continuing injuries.   (*Id.*).

28.     In awarding future damages for medical and other related expenses, the award must be for an amount for each year of the Plaintiff's life in which he will incur such damages.  Because the Plaintiff in this case claims future medical expenses for medications and counselling in the amount of $55,420.00 (Pls. Am. Proposed Findings of Fact and Conclusions of Law, Doc. 64, at 62), such damages up to that amount may be awarded without reduction to present value.  (*See* Pa. S.S.J.I. (Civ.) § 14.160).

29.     With respect to past lost earnings and lost earning capacity, the Plaintiff is entitled to be compensated for the amount of all earnings that he has lost up to today as a result of his injuries.  This amount is the difference between what he could have earned but for the harm, less any sum he actually earned in any employment.  It is not essential to recovery that the Plaintiff has been employed.  His opportunities for employment should be considered in determining the amounts he could have earned.  (Pa. S.S.J.I. (Civ.) § 14.150).

30.     With respect to future loss of earnings and lost earning capacity, the Plaintiff is also entitled to receive a sum of money that fairly and adequately compensates him for all future loss of earnings and earning capacity.  This requires that the total amount the Plaintiff would have earned for the period during which he will be disabled if the injury had not occurred.  From this amount, the total amounts that the Plaintiff will be able to earn for the period during which he will be disabled must be subtracted.

In determining the sum awarded for the Plaintiff's future loss of earnings and earning capacity, any evidence that has been presented concerning the effect of productivity and inflation on the amount of this loss must be considered.  In addition, the following must also be considered:  (a)  the Plaintiff's age, educational and work experience; (b) the Plaintiff's physical condition before and after the injury; (c) the work that the Plaintiff has done in the past or was capable of doing; (d) the work that the Plaintiff would have been doing in the future had the injury not occurred; (e) the extent and duration of the Plaintiff's injury; (f)  the work the Plaintiff will probably be able to do in the future with the injury; (g) the effect

increases in productivity have on the amount of this loss; (h) the effect inflation will have on the amount of this loss; (i) any other matters in evidence relevant to this determination.

In determining Plaintiff's lost future earnings or earning capacity, any expert testimony presented concerning reduction to present value based upon a reasonably secure fixed-income investment should be considered to reduce the loss of future earnings or earning capacity to present value. (*Id.*).[3]

31.    With respect to past and future non-economic damages, there are four items that make up a damage award for non-economic loss, both past and future:

(1) Pain and suffering,

 (2) Embarrassment and humiliation,

(3)  Loss of ability to enjoy the pleasures of life, and

(4)  Disfigurement.

The Plaintiff is entitled to be fairly and adequately compensated for all physical pain, mental anguish, discomfort, inconvenience, and distress that this Court finds he has endured from the time of the injury until today.  The Plaintiff is also entitled to be fairly and adequately compensated for all physical pain, mental anguish, discomfort, inconvenience, and distress which the Court finds the Plaintiff will endure in the future as a result of his injuries. (*Id.*).

---

[3] No expert testimony was presented at trial with respect to reduction to present value as to any loss of future earnings or loss of earning capacity.

32.     The Plaintiff is entitled to be fairly and adequately compensated for such embarrassment and humiliation as the Court finds he has endured and will continue to endure in the future as a result of his injuries.  (*Id*.).

33.     The Plaintiff is entitled to be fairly and adequately compensated for the loss of his ability to enjoy any of the pleasures of life as a result of the injuries from the time of the injuries until today and to be fairly and adequately compensated for the loss of his ability to enjoy any of the pleasures of life in the future as a result of his injuries. (*Id*.).

34.     The disfigurement that the Plaintiff has sustained is a separate item of damages recognized by the law.  Therefore, in addition to any sums awarded to the Plaintiff for pain and suffering, for embarrassment and humiliation, and for loss of enjoyment of life, the Plaintiff is entitled to be fairly and adequately compensated for the disfigurement he has suffered from the time of the injury to the present and that he will continue to suffer during the future duration of his life. (*Id*.).

35.     In determining the Plaintiff's claim for damage for past and future non-economic loss, the following factors are to be considered:  (1) the age of the Plaintiff, (2) the severity of the injuries, (3) whether the injuries are temporary or permanent, (4) the extent to which the injuries affect the ability of the Plaintiff to perform basic activities of daily living and other activities in which the plaintiff previously engaged, (5) the duration and nature of medical treatment, (6) the duration and extent of the physical pain and mental anguish the Plaintiff has experienced in the past and will experience in the future, (7) the health and

physical condition of the Plaintiff prior to the injuries, and (8) in the case of disfigurement, the nature of the disfigurement and the consequences for the Plaintiff. (*Id*.).

36.    Jean Neupauer is entitled to be compensated for the past, present, and future loss of the injured party's services to her and the past, present, and future loss of companionship of her spouse. "Consortium claims are losses arising out of the marital relationship. Consortium is the marital fellowship of a husband and a wife and includes the company, society, cooperation, affection, and aid of the other in the marital relationship. Such claims include a loss of support, comfort, and assistance, a loss of association and companionship, and the loss of ability to engage in sexual relations." (Pa. S.S.J.I. (Civ.) § 7.140).

37.    Plaintiff presented no evidence or claim for past medical expenses and accordingly, the Court does not award the Plaintiffs any amount for past medical expenses.

38.    The Court does not award future medical expenses for psychiatric or psychological services because the Plaintiffs failed to sustain their burden of proof that future medical expenses for such services will be incurred and their burden to show the reasonable estimated cost of such services. *See Keifer v. Reinhart Foodservices, LLC,* 563 F.App'x. 112, 116 (3d Cir. 2014)("In the context of a claim for future medical expenses, the movant must prove, by expert testimony, not only that future medical expenses will be incurred, but also the reasonable estimated cost of such services.").

Dr. Fischbein's recommendation that Gary Neupauer receive psychiatric and psychological treatment for his diagnosis of major depression is stated conditionally and made subject to Mr. Neupauer's agreement to be treated by a psychiatrist or a psychologist. The record contains no statement by Mr. Neupauer or other probative evidence that Mr. Neupauer has ever agreed to be seen by a psychiatrist or psychologist for treatment. Thus, Dr. Fischbein only recommends such treatment and conditions its provision on Mr. Neupauer's agreement:

> Q:     Doctor, what would the recommendations that you've made for Gary that he needs, as a result of the problems, as you've described them?

> A:     Well, number one, he should be placed on an antidepressant such as Cymbalta. The family doctor could clearly prescribe that, and *ideally, if Mr. Neupauer would agree,* he should be seen by a psychologist experienced in treating depression, complicated by chronic pain.

(Trial Tr., May 15, 2017, at 167:18-25)(italics added).

When Dr. Fischbein details the role that he envisions a psychiatrist and psychologist could play in treating the depression which Dr. Fischbein diagnosed Mr. Neupauer as having, he once again was less than specific with respect to the length of time such services should be provided. Thus, for instance, he states with respect to the psychologist:

> And the time frame I had, in the ideal world, would be he would be seen every seven to ten days for, at least, a four to six month-period. Then for the next four to six months, every two to three weeks for four to six months, and then seeing the psychologist monthly thereafter to just check in.

(*Id.* at 168:19-24).

Dr. Fischbein's estimated cost for a psychiatrist for a one hour session of $300 an hour and for psychotherapy at $150 an hour (*Id.* at 169:16-18; 170:8-9) was presented without supporting evidence and seems to be merely the generalized, unsupported opinion of Dr. Fischbein with no reference to the specific hourly rates of any particular psychiatrist or psychologist.

Again, the Court finds most significant that Gary Neupauer has not at any time since the amputation of his toes and related tissue of his left foot, sought the services of a psychiatrist or psychologist. In fact, Mr. Neupauer saw Dr. Fischbein only when he was sent to him by his counsel in this case in connection with this litigation. Mr. Neupauer was seen by Dr. Fischbein for an hour and fifteen minutes on October 27, 2016, and for a forty-five minute period on November 15, 2016. (*See* Independent Psychiatric Report of Dr. Fischbein, Pls. Ex. 16). Moreover, Dr. Fischbein testified that he discussed "different treatment options" with Mr. Neupauer, asked him about Cymbalta and Effexor, and testified that Mr. Neupauer "wasn't having much of it, he was listening, but wasn't having much of it." (Trial Tr., May 15, 2017, at 155:18-20). Against this testimony as stated above, there is no evidence in the record that Gary Neupauer ever expressed an interest in, or willingness to avail himself of, psychiatric or psychological treatment or services. This Court thus cannot conclude that future medical expenses for such services will be incurred by Mr. Neupauer. This becomes particularly significant when one considers the testimony of Dr. Fischbein who expressly conditioned his recommendations for psychiatric and psychological treatment

on Mr. Neupauer's agreement, which the record shows was not given. Thus nothing in the record evidences any willingness on the part of Plaintiff Gary Neupauer to agree to treatment or counseling by a psychiatrist or psychologist. In the absence of any such evidence, the Court cannot conclude that future medical expenses for psychiatric or psychological treatment will be incurred.

39. With respect to the Plaintiff's claim for future medical expenses for the drug, Cymbalta, Mr. Neupauer testified that his relationship with his wife improved after taking the Cymbalta which Dr. Fischbein suggested to Mr. Neupauer's family physician, Dr. Klynoski, be prescribed for Mr. Neupauer. He testified:

> Q: How does that affect your relationship with your wife?
>
> A: Well, at the time, it was really affecting us. I could see it was affecting her more than me because I didn't realize it. But since I went on that medication from Dr. Fischbein, I believe is his name, everything is working out better, and I did that for my wife – actually, for myself – but basically for her, the pill, whatever it is – Cymbalta, I can't remember...

(Trial Tr., May 16, 2017, at 70:24-25; 71:1-6).

Dr. Fischbein testified that Cymbalta costs three or four dollars a pill. (Trial Tr., May 15, 2017, at 171:21-23). Dr. Fischbein further opined that Mr. Neupauer should be on Cymbalta "indefinitely." (*Id*.). Dr. Fischbein, however, noted with respect to Cymbalta that "[t]he family doctor could clearly prescribe that . . . ." (*Id*. at 167:21-23). However there is no testimony from the Plaintiff's family doctor. Instead, Dr. Fischbein testified that he called Dr. Klynoski, the Neupauer's family physician, who he acknowledged was "in charge of

prescribing the Cymbalta" and recommended Cymbalta to Dr. Klynoski who placed Gary Neupauer on that drug. The Court finds this series of events puzzling and somewhat disturbing, since a physician retained to conduct an independent psychiatric report, who then recommends to the patient's treating physician that a certain drug be administered and then later opines that that drug should be administered for the rest of that patient's life, risks straying beyond the boundary of his role as a non-treating expert. The Court, therefore, will award the sum of $10,000 for future medical expenses for the treatment by Mr. Neupauer with Cymbalta in the absence of any testimony from his treating physician as to its continued efficacy and its cost.

40. "Under Pennsylvania law, a Plaintiff seeking recovery for total loss of earning power must show two things: (1) a permanent injury and (2) a total impairment of earning power." *Gary v. Mankamyer*, 403 A.2d. 87, 90 (Pa. 1979).

Further, "[i]t is settled Pennsylvania law that where there is evidence that the Plaintiff has suffered disabling permanent injury, it is a jury question as to whether such injury will 'shorten' his 'economic horizon' and thereby result in a future loss of earning power." *Keifer*, 563 F.App'x at 115 (quoting *Frankel v. Todd*, 393 F.2d 435, 438 (3d Cir. 1968)). The Court in *Keifer* further observed that "[a]lthough expert testimony is required to prove the permanency of a plaintiff's injury, it is not required to prove loss of earning capacity." *Id.* (internal citations omitted).

Here the record shows that Gary Neupauer has a permanent injury and a total impairment of earning power.

Even the Government's expert witness, Dr. Uribe, agreed that Gary Neupauer "ended up with permanent neuropathy in his foot and ended up with an amputation of his two toes" as a result of the breach of the standard of care by Drs. Adajar and Shaikh. (Finding of Fact, at ¶ 227). Dr. Janerich testified that Gary Neupauer's condition is "currently chronic, permanent and progressive." (*Id*. at ¶ 266). This permanent injury as described by both Dr. Uribe and Dr. Janerich as neuropathy and amputation of toes with accompanying tissue loss is clearly permanent, and the record evidence shows that it has led to a total impairment of earning power on the part of Gary Neupauer. First, the amputation affects Gary Neupauer's ability to walk. (*Id*. at ¶ 189). Gary Neupauer testified "I walk, sort of, with a limp, and I do have to have a shoe on or I cannot walk. And my balance is off quite a bit. If I have to get up too fast I will sometimes wobble, I have to grab onto something, and I do get pain walking." (*Id*.). Further, this Court's observation of Gary Neupauer walking in the courtroom showed an irregular and unbalanced gait. (*Id*.). Gary Neupauer's testimony as to his inability to walk is supported by Dr. Janerich's testimony, who testified that Mr. Neupauer has "reached maximum medical benefit from treatment which has fallen short of a full and complete recovery" and that his partial amputation has created a biomechanical imbalance which will "continue with every single step he tries to take creating an imbalance of forces on the ankle joint, the knee joint, the hip joint and the lower back." (*Id*. at ¶ 265).

As a result of the partial amputation of his left foot, Gary Neupauer has developed neuropathy as a result of the amputation described as "sensory hyperesthesia." (Findings of Fact, at ¶¶ 257-258). The partial amputation of Neupauer's left foot has, by the testimony of Dr. Janerich, rendered him "unable to participate in activities he used to enjoy freely." (*Id*. at ¶ 261). Gary Neupauer has, as a result of the partial amputation of his left foot, specifically including the great toe, lost gross motor skills that are involved in standing, walking, balancing, and using the ankle and foot in operating a motor vehicle. (*Id*. at ¶ 262). Dr. Janerich has testified that Gary Neupauer cannot work "because his condition limits him. The physical demands of work exclude what he can do safely." (*Id*. at ¶ 267). Dr. Janerich further gave his opinion with respect to Gary Neupauer's limitations as follows:

> I indicated that Gary can sit for up to eight hours without changes in position. That he can stand no more than one hour. This is in an eight-hour potential work day. And that he can walk no more than one hour within an eight hour potential work day. That he should never lift, carry, push or pull loads greater than ten pounds, though he can occasionally lift and carry loads up to ten pounds.
>
> He can occasionally bend, but never squat, crawl, climb, and he can occasionally reach and twist. I also indicated that he can use his right and left hand for fine manipulation, simple grasping and pushing and pulling.
>
> He cannot use his left foot for any type of repetitive activities. And then the question was asked of me can he return to work either full-time or part-time. None were checked. Has he achieved maximum medical improvement, I checked yes. Patient can return to his or her regular occupation, nothing is checked. And under comments I stated no work is advisable.

(*Id*. at ¶ 268; *see also*, *id*. at ¶ 269).

Vocational Rehabilitation and Disability Specialist, Patricia Chilleri, conducted a Transferable Skills Analysis "to determine what type of skills Gary possesses that could possibly transfer to alternative employment." Based on her review of the medical records and her completion of the Transferable Skills Analysis she testified that:

> [T]here are no skills that Gary has that would transfer to light or sedentary work activity. The skills that he had would transfer to, at the very least, medium work activity which is work which involves lifting or carrying a maximum of 50 pounds, on an occasional basis, more frequent lifting and/or carrying of 25 pounds, but medium-duty involves continuous standing and walking and could possibly involve climbing of ladders.

(Finding of Fact, at ¶ 294). The Court credits Ms. Chilleri's opinion stated above as well as her opinion that:

> Mr. Neupauer has a total vocational disability, which would preclude him or eliminate from performing competitive employment in today's labor market. In my opinion, there are no jobs that exist in today's labor market that he would be capable of performing on a consistent and sustained basis.

(*Id.* at ¶ 295). The Court further credits Ms. Chilleri's opinion that Gary Neupauer "has no transferability of skills that would take him down to sedentary or light work." (*Id.* at ¶ 297).

The Court bases its conclusion of total loss of earning power upon the testimony of Ms. Chilleri and her use of the Gamboa Gibson Work Life Tables that Gary Neupauer had 4.6 years remaining in his work life expectancy, based on his age, 62, at the time of his surgery, and his education at the high school completion level. (*Id.* at ¶ 298). The Court also credits Ms. Chilleri's testimony that, using Pennsylvania Wilkes-Barre/Scranton MSA statistics, that the median earnings for a cutting machine setter/operator in the Wilkes-

Barre/Scranton MSA is $35,140 annually up to $41,320 which falls in the experienced category.

Using an anticipated work life expectancy of 4.6 years, based on the testimony of Ms. Chilleri, the anticipated impairment of earning potential for a cutting machine operator is within a range of $161,644.00 to $190,072.00. (Finding of Fact, at ¶ 301). Further, Ms. Chilleri testified based on the financial information she reviewed for Mr. Neupauer, that the most money he earned in any one year as a shearer operator was $29,539.00 in 2011. (*Id.* at ¶ 306). The Court concludes that based on Gary Neupauer's 40 years as a shearer machine operator that he is an experienced operator who has sustained a total impairment of earning power of $35,140.00 annually for the 4.6 year period from age 62, the time of the United States' negligence, to age 66, for a total loss of earnings of $161,644.00, to compensate him for past and future lost earnings. Specifically, the Court finds that Mr. Neupauer is entitled to $146,417.00 for past lost earnings from the age of 62 to today, and $15,227.00 for future lost earnings from today until May, 2018.[4]

---

[4] Crediting Ms. Chilleri's testimony that Mr. Neupauer had 4.6 years remaining in his work life expectancy, which is the equivalent of 55.2 months, and this Court's finding that Plaintiff would have made $161,644.00 during this time, Plaintiff would have made approximately $2,928.33 per month for 55.2 months. Thus, Plaintiff is entitled to $146,417.00 for past lost earnings ($2,928.33 x 50 months) and $15,227 for future lost earnings ($2,928.33 x 5.2 months).

41.    For the pain and suffering, embarrassment and humiliation, loss of ability to enjoy the pleasures of life, the Court, based on its Findings of Fact as stated herein, concludes that the Plaintiff, Gary Neupauer, has suffered sustained pain and suffering, embarrassment and humiliation, loss of ability to enjoy the pleasures of life.  The Court therefore finds Gary Neupauer is entitled to be compensated for his past, present and future pain and suffering, embarrassment and humiliation and loss of ability to enjoy the pleasures of life in the amount of $400,000.

42.    The Court also concludes that Gary Neupauer has suffered disfigurement. With respect to disfigurement, Pennsylvania law requires that in addition to any sums awarded to Gary Neupauer for pain and suffering, for embarrassment and humiliation and for loss of enjoyment of life, he is to be fairly and adequately compensated for the disfigurement he has suffered from the date of the amputation of the toes of his left foot and subsequent surgeries and related tissue loss which he will continue to suffer during the future duration of his life.  The Court therefore awards as a separate item of damages the sum of $175,000 for disfigurement.

43.    With respect to the loss of consortium claim of Plaintiff Jean Neupauer, the Court awards the sum of $50,000.  The Neupauers have been married since 2007 but had been together since 1991. (Trial Tr., May 16, 2017, at 31:20-25).  They have lived together since 1999.  (*Id*. at 32:20-22).  Mrs. Neupauer detailed the changes in Gary Neupauer's behavior and the effect it had on their marital relationship.  (*See* Finding of Fact, at ¶ 281).

She testified that since the surgeries that Gary Neupauer underwent they have not had sexual relations although they were sexually active previously. (*Id.* at ¶ 282). She testified that Gary Neupauer would be "very mean", that he would "pick on any little thing that [she] said and make a big issue out of it." She further testified that she felt like she "had to just be quiet and walk on eggs. I had to agree with everything he said or he would make a big issue out of it and then we would get in a big fight, and I would just walk away because I don't like to fight." (Trial Tr., May 16, 2017, at 38:19-25). However, she did add that: "[p]ersonally, we're okay, I mean, we get along really well." (*Id.* at 39:4-5). She repeated this statement saying, "[l]ike I said, we get along good." (*Id.* at 39:11-12). Nonetheless, Jean Neupauer's testimony credibly establishes that during the period beginning with Gary Neupauer's surgeries, she has sustained a distinct, if not complete, loss of the marital relationship that she had enjoyed prior to those events. Jean Neupauer was deprived of the company, society, cooperation, affection, and comfort of her partner that she had previously enjoyed and therefore is entitled to be compensated accordingly.

## V. CONCLUSION

For the foregoing reasons, a verdict shall be entered in this case in favor of Gary Neupauer and Jean Neupauer and against the United States in the amount of $796,644.00, as follows:

1. Gary Neupauer's Future Medical Expenses - $10,000.00;

2. Gary Neupauer's Past and Future Lost Earnings - $161,644.00;

3. Gary Neupauer's Past, Present, and Future Pain and Suffering, Embarrassment and Humiliation, and Loss of Ability to Enjoy the Pleasures of Life - $ 400,000.00;

4. Gary Neupauer's Disfigurement - $ 175,000.00;

5. Jean Neupauer's Loss of Consortium - $50,000.00.

Because this Court finds the United States 100% negligent, judgment will be entered

in favor of Gary Neupauer and Jean Neupauer and against the United States in that full

amount. A separate Order of Judgment follows.

Robert D. Mariani
United States District Judge